**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| LERITHEA ROLAN and LAMOTTCA BROOKS, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-357-TLS |
| | ) | |
| ATLANTIC RICHFIELD COMPANY, E.I. DU PONT DE NEMOURS AND COMPANY, and THE CHEMOURS COMPANY, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the Court on a Motion to Certify Class [ECF No. 4], filed by

Plaintiffs LeRithea Rolan and Lamottca Brooks, individually and on behalf of all others similarly

situated, a Motion to Dismiss [ECF No. 39] filed by Defendant Atlantic Richfield Company, and

an Amended Motion to Dismiss [ECF No. 45] filed by Defendants E.I. du Pont de Nemours and

Company, and the Chemours Company. These matters are briefed and ripe for the Court's

review.

**COMPLAINT ALLEGATIONS**

**A.      Background**

This Complaint [ECF No. 1] involves remediation efforts at the USS Lead Superfund Site

in East Chicago, Indiana, and the effect of those efforts on local residents. Plaintiff LeRithea

Rolan is an Indiana citizen who has resided within the West Calumet Public Housing Complex

(West Calumet) in East Chicago since April 2008. (Compl. ¶ 2, ECF No. 1.) She has one child

who lives with her. (*Id.*) Plaintiff Lamottca Brooks is also an Indiana citizen who has lived

within West Calumet since September 2012. (*Id.* ¶ 3.) She has six children who live with her. (*Id.*) The West Calumet Public Housing Complex is owned and operated by the East Chicago Housing Authority (ECHA). (*Id.* ¶¶ 1, 13.)

"Defendant Atlantic Richfield Company is a corporation organized under the laws of the State of Delaware with its principal place of business in California." (*Id.* ¶ 4.)[1] The Plaintiffs allege that Defendant Atlantic Richfield "owned and operated white lead and zinc oxide manufacturing and metal refining facilities at 151st and McCook Avenue in East Chicago, . . . which includes West Calumet." (*Id.* ¶ 10.) Specifically, Defendant Atlantic Richfield's operations "include[d] a pulverizing mill, white lead storage area, a chemical laboratory, a machine shop, a zinc oxide experimental unit building and plant, a silver refinery and a zinc refinery," and the Defendant "generated, dumped, spilled, or otherwise released lead and arsenic into" an area that includes the Plaintiffs' residences. (*Id.*)

Defendants E.I. du Pont de Nemours and Company, and the Chemours Company, are corporations organized under the laws of, and with their principal places of business in, the State of Delaware. (*Id.* ¶¶ 5–6.)[2] "DuPont owns, and for many years owned and operated a pesticide lead arsenate production facility at 5215 Kennedy Avenue in East Chicago, which is in close proximity to" West Calumet. (*Id.* ¶ 11.) "At and from its facility, DuPont generated, dumped, spilled, or otherwise released lead and arsenic onto its property and into" an area that includes the Plaintiffs' residences. (*Id.*) The Plaintiffs allege that they have "unwittingly been exposed to

---

[1] Defendant Atlantic Richfield "is a successor to the liability of International Lead Refining Company, International Smelting Company, International Smelting and Refining Company, Anaconda Lead Products Company, Anaconda Copper Mining Company, and the Anaconda Company." (*Id.*)

[2] According to the Plaintiffs, "Chemours is a spinoff from [E.I. du Pont de Nemours and Company] that purports to have taken responsibility for some, or all, of [E.I. du Pont de Nemours and Company's] environmental liabilities." (*Id.* ¶¶ 5–6.) Throughout this Opinion, the Court refers to both entities collectively as "Defendant DuPont."

dangerous levels of lead and arsenic released from [the Defendants' facilities] through ingestion, inhalation and dermal exposure." (*Id.* ¶ 12.)

## B.    Remediation Efforts in 2016

Starting in December 2014 and continuing into 2015, the United States Environmental Protection Agency (EPA) sampled soil for lead[3] and arsenic[4] in the front and backyards of all West Calumet residences. (*Id.* ¶ 14.) "In July 2016, the EPA informed Plaintiffs . . . that it found dangerously high levels of lead and arsenic in the soil at their homes." (*Id.*) The Plaintiffs allege that these notifications from the EPA in July 2016 "were the first time that [they] . . . knew, or should have known, of the dangerous levels of lead and arsenic in" West Calumet. (*Id.* ¶ 20.)

After notifying the Plaintiffs and others in July 2016, EPA officials told West Calumet residents "to keep their windows closed and keep children inside at all times." (*Id.* ¶ 17.) Specifically, a July 2016 flyer addressed to West Calumet residents advised the Plaintiffs "to prevent children from playing in dirt or mulch, to wash their children's toys regularly, and to wash children's hands after they play outside. All residents should remove shoes before walking into their homes" as well as avoid "disturb[ing] the mulch or dig or garden in their yards." (*Id.* ¶ 17, Ex. 4.) Furthermore, the EPA advised that "West Calumet residents may have their children's blood lead levels tested by calling the East Chicago Health Department." (*Id.*)

---

[3] "According to [the] EPA, lead is highly toxic and exposure can be dangerous, especially for children six or younger, who are particularly at risk when exposed to lead. Even low levels of lead in the blood of children can cause irreversible behavioral problems, learning disabilities and impaired growth. Very high blood levels can cause severe neurological problems such as comas, convulsions and death." (*Id.* ¶ 15.)

[4] "According to [the] EPA, arsenic is a human carcinogen. Exposure to arsenic can cause adverse health effects, such as gastrointestinal harm, irritation of the skin and mucous membranes, negative impacts on the brain and nervous system, and lung, skin, bladder and liver cancer." (*Id.* ¶ 16.)

As a result of these notices, the Plaintiffs and their children were "stuck inside their homes," "scrambled and expended resources to find alternative temporary housing when possible," and would only "return[] to their homes . . . when absolutely necessary." (*Id.* ¶ 18.) Additionally, the Mayor of East Chicago sent letters to the Plaintiffs and other West Calumet residents in July 2016, "telling them to abandon their homes for their own safety," noting that it was in "[their] best interest to relocate [their] households to safer conditions." (*Id.* ¶ 19, Ex. 5.) Also at that time, the ECHA informed the Plaintiffs and other West Calumet residents that it desired "to demolish [the] 346 units located at the West Calumet Housing Complex." (*Id.* ¶ 21, Ex. 6.) Governmental officials would later "inform[] Plaintiffs . . . that all West Calumet residents must vacate their homes on or before November 30, 2016." (*Id.*) Finally, "in August 2016, authorities closed the Carrie Gosch Elementary School," which serves West Calumet. (*Id.*)

The Plaintiffs allege that the Defendants' "releases [of hazardous substances] have disrupted, and continue to disrupt, the[ir] lives . . . on a daily basis, causing considerable stress, aggravation, annoyance, inconvenience and discomfort." (*Id.* ¶ 22.) They "have also expended time and money to respond to the releases of lead and arsenic, including, but not limited to, investigating the nature of release and making arrangements for alternative temporary housing and relocations." (*Id.*) And the "lead and arsenic from Defendants has threatened the health of Plaintiffs [and] their children," and "exposes them to injury and the fear of future injury, including increased cancer rate and irreversible health impacts." (*Id.* ¶ 23.)

## C.    Procedural Background

The Plaintiffs filed this Complaint and a Motion to Certify Class on October 6, 2016. In their Complaint, the Plaintiffs assert three claims against both Defendants. Count I is a claim

under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C.

§ 9601 (CERCLA). (*Id.* ¶¶ 33–41.) Under Count I, the Plaintiffs allege that they have

> incurred and continue to incur "response" costs within the meaning of . . .
> CERCLA, 42 U.S.C. §§ 9601(23)–(25), including, but not limited to, preliminary
> investigations of the contamination of Plaintiffs' . . . properties, and temporary
> housing and relocation costs. All such costs are necessary costs of response, and,
> to the extent required, consistent with the National Contingency Plan. Plaintiffs
> . . . will continue to incur such response costs in the future. Plaintiffs . . . are
> entitled to full reimbursement from Defendants for all such costs.

(Compl. ¶ 41.) In Count II, the Plaintiffs assert a claim under Indiana law for nuisance, and in

Count III they assert a claim under Indiana law for negligence. With regard to their Motion to

Certify Class, the Plaintiffs' proposed class consists of:

> All persons who currently, or, since being told in July 2016 by EPA of the lead
> and arsenic levels in their neighborhood, reside(d), on property that has been
> impacted, or a threat exists that it will be impacted, by lead and arsenic from
> Defendants' properties in and adjacent to the Class Area.
>
> The Class Area is defined generally as bordered: (1) on the north by the northern
> boundary of the Carrie Gosch Elementary School and a line extending eastward
> from that boundary to the eastern edge of a north/south utility right of way that
> runs parallel to McCook Avenue north of East 149th Place; (2) on the east by: (i)
> the eastern-most edge of a north/south utility right of way that runs parallel to
> McCook Avenue until East 149th Place, and (ii) McCook Avenue between East
> 149th Place and 151st Street; (3) on the south by East 151st Street; and (4) on the
> west by the Indiana Harbor Canal.

(Mot. Certify 1–2, ECF No. 4.)

Defendant Atlantic Richfield filed its Motion to Dismiss for Failure to State a Claim on

January 9, 2017, as well as a Memorandum in Support [ECF No. 40] and Motion for Judicial

Notice [ECF No. 41]. Defendant DuPont filed its Amended Motion to Dismiss on January 10,

2017, and a Memorandum in Support [ECF No. 43] and Motion for Judicial Notice [ECF

No. 44] on January 9, 2017. The Plaintiffs filed their Consolidated Memorandum in Opposition

to Defendants' Motions to Dismiss [ECF No. 49] on February 23, 2017. Then on March 16,

2017, Defendant DuPont filed its Reply [ECF No. 51] and a Supplement to its Motion for

Judicial Notice [ECF No. 52]. On that same date, Atlantic Richfield also filed its Reply [ECF

No. 53]. This case was reassigned to the undersigned on May 1, 2017. [*See* ECF No. 55.]

## STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the

sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chicago*, 910 F.2d

1510, 1520 (7th Cir. 1990). A court presumes all well-pleaded allegations to be true, views them

in the light most favorable to the plaintiffs, and accepts as true all reasonable inferences to be

drawn from the allegations. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th

Cir. 1995).

The Supreme Court has articulated the following standard regarding factual allegations

that are required to survive dismissal:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his
> "entitlement to relief" requires more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will not do. Factual allegations must
> be enough to raise a right to relief above the speculative level, on the assumption
> that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks, ellipsis, citations, and

footnote omitted). A complaint must contain sufficient factual matter to "state a claim that is

plausible on its face." *Id.* at 570. "A claim has facial plausibility when the pleaded factual

content allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at

556).

Although a court must accept as true all well-pleaded facts and draw all permissible inferences in the plaintiffs' favor, it need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly* at 555). Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations move the claims from conceivable to plausible, they are insufficient to state a claim. *Id.* at 680. Plaintiffs can also plead themselves out of court if they plead facts that preclude relief. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006). Finally, determining whether a complaint states a plausible claim for relief requires a reviewing court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## JURISDICTION

The Court has subject-matter jurisdiction over the Plaintiffs' CERCLA claims pursuant to 28 U.S.C. § 1331. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over the Plaintiffs' claims for nuisance and negligence because they "are so related" to the CERCLA claim "that they form part of the same case or controversy." *Id.* § 1367(a).

## ANALYSIS

The Court analyzes the Defendants' Motions first by considering whether the Plaintiffs have standing. Next, the Court considers the Defendants' arguments that the Plaintiffs' CERCLA allegations fail to state a claim upon which relief can be granted. Then, the Court considers the Defendants' arguments that the Plaintiffs' allegations fail to state either a claim for nuisance or for negligence. Finally, the Court considers Defendant DuPont's argument that the Complaint lacks required parties.

A.    **Standing**

Standing is a constitutional requirement for which a plaintiff must show (1) "injury in fact," which is an invasion of a legally protected interest that is either "concrete and particularized" or "actual and imminent," rather than conjectural or hypothetical; a (2) causal connection such that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) that it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Defendant DuPont argues that the Plaintiffs have failed to allege all three of the requisite elements of standing. First, the Plaintiffs' alleged injury is a "fear of future injury . . . , which is too speculative to satisfy the 'actual or imminent requirement.'" (Mem. in Supp. of Def. DuPont's Mot. Dismiss 4, ECF No. 43 (citing *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)).) Second, the Plaintiffs fail to demonstrate causation because they "do not and cannot credibly allege that *all* of the harm they suffered was the result of [Dupont's] conduct." (*Id.* 4–5.) Instead, the Plaintiffs "allege they were harmed by multiple parties . . . , including parties not named as defendants in this action." Third, "it is speculative whether a court would be able to craft remedies specific to Moving Defendants to redress their alleged injuries." (*Id.* at 5.) The Plaintiffs believe that they have adequately alleged standing in their Complaint.

The Court finds that the Plaintiffs have sufficiently alleged standing for purposes of Article III. The Plaintiffs need not allege that they have already been contaminated to have sufficiently alleged an injury. For purposes of standing, "risk of contamination" is an "actual and imminent" injury. *See, e.g.*, *Covington v. Jefferson Cty.*, 358 F.3d 626, 638 (9th Cir. 2004) (holding that neighboring plaintiffs adequately alleged injury because "[s]uch risks from

8

improper operation of a landfill are in no way speculative when the landfill is your next-door neighbor"); *Carlough v. Amchem Prods., Inc.*, 834 F. Supp. 1437, 1457 (E.D. Pa. 1993) ("[E]xposure to [hazardous substances] causes immediate bodily injury . . . , even if disease is not manifested until much later.") (internal quotation marks omitted); *see also Todd v. Collecto, Inc.*, No. 12 C 4984, 2012 WL 5510226, at *1 (N.D. Ill. Nov. 13, 2012) ("Plaintiff alleges that defendant's conduct caused him to suffer emotional distress, a sufficient injury to give him constitutional standing."). In addition, the Plaintiffs allege that they have incurred response costs in the form of relocation services and the inability to enjoy their land, which are sufficient for purposes of an Article III injury.

With regard to causation, Defendant DuPont's argument ignores that CERCLA imposes joint and several liability upon responsible actors. *See Metro Water Reclamation Dist. v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007). For instance, if one party sends a single barrel of hazardous substances to a remediation site that includes 100 barrels, that one party could be held liable for the entirety of relevant CERCLA liability. The Plaintiffs' allegations adequately plead causation for purposes of Article III standing. Lastly, Defendant DuPont's argument that "it is speculative whether a court would be able to craft remedies" is without merit. The Plaintiffs seek compensatory damages, and compensatory damages satisfy Article III's redressability requirement. *King v. Ind. Supreme Ct.*, No. 14-CV-1092, 2014 WL 5798583, at *4 (S.D. Ind. Nov. 7, 2014).

In effect, Defendant DuPont's argument conflates the requirements for adequately alleging a claim with the requirements of standing. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) ("[O]ne must not confuse weakness on the merits with absence of Article III standing.") (internal quotation marks omitted); *Warth v. Seldin*,

422 U.S. 490, 500 (1975) (noting that "standing in no way depends on the merits" of a plaintiff's

claim, but "often turns on the nature and source of the claim"). Even if the Plaintiffs' allegations

do not survive the Defendants' Rule 12(b)(6) Motion, they satisfy the standing requirements of

Article III of the Constitution because they sufficiently plead a "case or controversy."

**B.    Count I—CERCLA Section 107(a) Claim for Cost Recovery**

Section 107(a) of CERCLA creates a private right of action to recover "necessary costs of

response incurred by any other person consistent with the national contingency plan." 42 U.S.C.

§ 9607(a)(4)(B). A prima facie case for CERCLA cost recovery requires a plaintiff to prove: "(1)

the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible

party; (3) there has been a release or there is a threatened release of hazardous substances; and

(4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore*

*Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008). In addition, a

nongovernmental plaintiff "must show that any costs incurred in responding to the release were

'necessary' and 'consistent with the national contingency plan (NCP).'" *Valbruna Slater Steel*

*Corp. v. Joslyn Manuf. Co.*, No. 1:10-CV-44, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015)

(quoting *Forest Park Nat. Bank & Tr. v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012)).

Response costs are those "costs of investigating and remedying the effects of a release or

threatened release of a hazardous substance into the environment." *Young v. United States*, 394

F.3d 858, 863 (10th Cir. 2005). These costs "are 'necessary' if they are incurred in response to a

threat to human health or the environment and they are necessary to address that threat."

*Valbruna Slater Steel Corp.*, 2015 WL 8055999, at *4 (citing *G.J. Leasing Co. v. Union Elec.*

*Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994)).

CERCLA authorizes the EPA "to act, consistent with the National Contingency Plan (NCP), to remove or arrange for the removal of . . . [any] hazardous substance, pollutant, or contaminant at any time . . . ." 42 U.S.C. § 9604(a)(1). These provisions give EPA broad powers "to select appropriate remedial actions determined to be necessary to be carried out" under the statute. *Id.* § 9621(a); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). The allegations and supplemental materials provided in the briefing show that the EPA's Remediation Plan at the West Calumet Site was formulated consistent with the NCP. (*See* Consent Decree ¶ V.7, ECF No. 41-2.)[5]

The Defendants' Motions[6] do not contest the first three elements of the Plaintiffs' CERCLA § 107(a) cost recovery claim. However, they proffer three reasons why this claim should be dismissed, all addressed to the issue of "response costs." First, the Plaintiffs' allegations are only legal conclusions and insufficient to state a claim. Second, the Plaintiffs are specifically precluded from recovering the costs of investigation when they are duplicative of federal costs. Third, any relocation costs are both unnecessary and inconsistent with the NCP.

## 1.    *Pleading Standard for Alleging a Cost Recovery Claim*

The Defendants argue that the Complaint only alleges that "[a]ll such costs are necessary costs of response, and, to the extent required, consistent with the [NCP]" (Compl. ¶ 41; *see* Def.

---

[5] A court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (citing *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991)); *see also Ennega v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) (noting that the affirmative defense of the statute of limitations may sometimes "be resolved at the motion-to-dismiss stage based on the allegations in the complaint and a few undisputable facts within [a court's] judicial-notice power"). Accordingly, the Court will consider the materials included in the Defendants' Motions for Judicial Notice, where pertinent.

[6] Defendant DuPont filed a separate Motion to Dismiss that mirrors most of the arguments that Defendant Atlantic Richfield raises to dismiss the Plaintiffs' CERCLA cost recovery claim. The Court considers the arguments raised in both Motions together.

DuPont's Mem. 6), which is a threadbare recital of a legal conclusion that does not plausibly state a claim.[7] In support of their argument, the Defendants present multiple cases in which a cost recovery claim was dismissed because of insufficient factual allegations. *See J & P Dickey Real Estate Family Ltd. P'ship v. Northrop Grumman Guidance & Elecs. Co.*, No. 2:11-CV-37, 2012 WL 925015, at *5 (W.D.N.C. Mar. 19, 2012); *Ford Motor Co. v. Mich. Consol. Gas Co.*, No. 08-CV-13503, 2010 WL 3419502, at *6 (E.D. Mich. Aug. 27, 2010); *Francisco-Sánchez v. Esso Standard Oil de P. R., Inc.*, No. Civ. 08-2151, 2010 WL 682542, at *4 (D.P.R. Feb. 22, 2010); *Gen. Cable Indus., Inc. v. Zurn Pex, Inc.*, 561 F. Supp. 2d 653, 658 (E.D. Tex. 2006).

The Plaintiffs argue that their allegations are sufficient because "they clearly link those response costs to hazardous substances generated by Defendants." (Pls.' Mem. in Opp'n to Defs.' Mots. Dismiss 6, ECF No. 49.) Specifically, these factual allegations are that the Defendants owned and operated "white lead and zinc oxide manufacturing and metal facilities" and "a pesticide lead arsenate production facility" (Compl. ¶¶ 10–11), that the Plaintiffs were exposed to the Defendants' lead and arsenic because of the Defendants' actions (*id.* ¶ 12), that the release of the lead and arsenic by Defendants was the result of the Defendants' acts or omissions (*id.* ¶ 24) and continues because of their "operation and maintenance of their facilities and equipment, their handling, storage, use, and disposal of hazardous substances and/or their failure to properly and effectively address such contamination" (*id.* ¶ 43), and that the Plaintiffs have been injured as a result (*id.* ¶¶ 41, 45, 51). The Plaintiffs argue that these allegations provide the Defendants with "fair notice of their claim and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2). Finally, they seek to distinguish those cases that the Defendants cite on the

---

[7] Defendant DuPont highlighted that the "Plaintiffs vaguely allege they have incurred and are incurring 'response costs, . . . including, but not limited to, preliminary investigations of the contamination . . . and temporary housing and relocation costs.'" (Compl. ¶ 41.)

grounds that they have alleged far more for their CERCLA cost recovery claim than the plaintiffs in those respective cases.

Although the Plaintiffs state that they need not "make the legal argument . . . as to why" the facts alleged in their Complaint meet the NCP's "necessary and consistent" legal standard for relief (Pls.' Opp'n 6), they are required to plead factual allegations showing it is plausible that their response costs were "necessary and consistent" with the NCP, *See Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006); *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995). In *J & P Dickey*, the complaint alleged that the plaintiffs "incurred response costs that are consistent with the [NCP]. Such response costs included but are not limited to, expenses for testing of ground water and soil and surveillance." 2012 WL 925015, at *5. However, the complaint was dismissed because it contained "no factual allegations supporting the claim that the soil and water testing and surveillance [we]re consistent with the National Contingency Plan." *Id.* Similarly, in *Francisco-Sánchez*, the counterclaim plaintiff alleged that it "incurred necessary costs of response consistent with the [NCP] to address the release or disposal of hazardous substances" 2010 WL 682542, at *4 (brackets in original). Because the counterclaim included "no details from which to infer [the counterclaim plaintiff's] compliance with CERCLA" and "conform[ity] with the NCP," dismissal of the counterclaim was proper. *Id.* And in *General Cable Industries*, the plaintiff alleged that it "incurred costs to investigate and monitor the contamination of its Property," and that it "expended response costs consistent with the [NCP]." 561 F. Supp. 2d at 658. Nowhere in that plaintiff's complaint were there any factual allegations of "what response costs it has incurred" or how they were "consistent with the [NCP]." *Id.*

*Ford Motor Co.* is particularly illustrative. There, the counterclaim plaintiff included "six paragraphs devoted to the CERCLA cost recovery count" but "only one general averment related to its costs of response." 2010 WL 3419502, at *5–6. General allegations were insufficient to state a claim for relief, as the counterclaim plaintiff was required to "specifically allege that the response costs were 'necessary.'" *Id.* at *6. The counterclaim plaintiff subsequently moved to amend, and the amended counterclaim stated that the plaintiff "incurred necessary response costs 'of the nature defined in CERCLA,' including removal costs, 'to monitor, assess, and evaluate the release or threat of release of hazardous substances.'" *See Ford Motor Co. v. Mich. Consol. Gas Co.*, No. 08-CV-13503, 2011 WL 1743735, at *5 (E.D. Mich. May 5, 2011). Additionally, the counterclaim plaintiff alleged that "response costs were incurred to analyze and investigate the nature, source, and extent of the contamination," that such response costs "enabled it to comment on [the] proposed remedy and to propose alternative remedial measures that more effectively address the releases and migration of the releases," and that the counterclaim plaintiff "faced and continues to face an actual risk that the contamination, if not properly abated, could migrate to its property." *Id.* These amended allegations in the counterclaim sufficiently demonstrated that the response costs were "necessary." *Id.*

The Court finds that the allegations in the Plaintiffs' Complaint are sufficient for purposes of federal pleading standards. Relevant to the Court's decision are the following allegations:

> 18. As a result of the July 2016 Notice and other communications by public officials . . . despite the summer weather, Plaintiffs . . . are stuck inside of their homes while in their neighborhood. Many residents of West Calumet, including Plaintiff Brooks and her children, have scrambled and expended resources to find alternative temporary housing when possible, and are returning to their homes only when absolutely necessary.

19. The lead and arsenic levels pose such a threat that in July 2016, East Chicago Mayor Anthony Copeland sent letters to over 1,000 West Calumet residents telling them . . . ., "Now that we know the levels of lead in the ground in West Calumet Housing Complex, we feel it is in your best interest to relocate your household to safer conditions."

21. . . . Officials have now informed Plaintiffs . . . that all West Calumet residents must vacate their homes on or before November 30, 2016, further throwing the lives of Plaintiffs . . . into turmoil, causing widespread panic, and requiring many to spend substantial time and resources searching for a new place to live.

22. . . . Plaintiffs and others in the Class Area have also expended time and money to respond to the releases of lead and arsenic, including, but not limited to, investigating the nature of release and making arrangements for alternative temporary housing and relocations.

41. As a result of the releases or threatened releases of hazardous substances, Plaintiffs . . . have incurred and continue to incur "response" costs within the meaning of [CERCLA], including but not limited to, preliminary investigations of the contamination of Plaintiffs' . . . properties, and temporary housing and relocation costs. All such costs are necessary costs of response, and, to the extent required, consistent with the [NCP].

(Compl. ¶¶ 18–19, 21–22, 41.) These allegations are not just "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Rather, they explain those specific response costs that the Plaintiffs incurred—namely, investigation of whether their current residences were contaminated and considerations of temporary housing. The Plaintiffs are not required to set out a legal argument in their Complaint as to why these response costs were "necessary" as a matter of law, only to put the Defendants on notice as to the nature of their claim. *See* Fed. R. Civ. P. 8(a). This is what their Complaint accomplishes.

2.    *Costs of Investigation*

Even if the Complaint is adequately pled, the Defendants argue that the Plaintiffs are nonetheless precluded from recovering any costs that they incurred from their own investigations. Initial investigation, site-assessment, and monitoring costs are generally

recoverable in a § 107 claim. *CNH Am., LLC v. Champion Env't Servs., Inc.*, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012). Proof of consistency with the NCP is not necessary for the recovery of investigation costs. *See Valbruna Slater Steel Corp.*, 2015 WL 8055999, at *4 (citing *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998)); *Carlyle Piermont Corp. v. Fed Paper Bd.*, 742 F. Supp. 814, 821–22 (S.D.N.Y. 1990) (citing cases). However, costs of investigation that are duplicative of work performed by the EPA are generally not considered "necessary," unless authorized by the EPA, and thus not recoverable. *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1263, 1272 (E.D. Cal. 1997); *La.-Pac. Corp. v. Beazer Materials & Servs., Inc.*, 811 F. Supp. 1421, 1245–46 (E.D. Cal. 1993) ("[I]nsofar as [plaintiff] seeks recovery of the costs associated with any part of its investigation conducted after October 8, 1986, the date it received notice from the EPA that its investigation was not authorized and that EPA would conduct the investigation, plaintiff's claim cannot stand."); *see also Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1111–12 (E.D. Mo. 2016).

The Defendants state that "[b]ased on Plaintiffs' own allegations, EPA investigated possible contamination and informed Plaintiffs of the results of those investigations, but only at that point did Plaintiffs allegedly incur 'investigation' costs." (Mem. in Supp. of Def. Atlantic Richfield's Mot. Dismiss 9, ECF No. 40 (citing Compl. ¶¶ 22, 41).) The Defendants argue that such costs are duplicative of the EPA's own investigative efforts into the contamination of their homes. For their part, the Plaintiffs argue that their allegations sufficiently show that their costs were not duplicative of the EPA's work but, at a minimum, they should be allowed to develop the record further to show why their investigation costs are "necessary." *G.J. Leasing Co.*, 54 F.3d at 382 (noting that the court's determination as to whether costs are "necessary" is a mixed question of law and fact). In its Reply, Defendant Atlantic Richfield offered precedent that courts

"dismiss claims at the pleadings stage that involve . . . 'mixed questions of law and fact.'" (Reply in Supp. of Def. Atlantic Richfield's Mot. Dismiss 7 n.3, ECF No. 53 (citing *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 359–62 (5th Cir. 2002); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008)).)

Those factual allegations from Summer 2016 are central to the Plaintiffs' argument. That is the time when they allegedly "first learned of the release of lead and arsenic onto their properties." (Pls.' Opp'n 9). However, at that same time the Plaintiffs received mixed messages from governmental agencies at the federal and local levels. The EPA notified the Plaintiffs of the hazardous materials at their homes but stated that the "land use of properties will remain unchanged." (*See* R. of Decision 49, ECF No. 42-5 ("The expected outcome of the Selected Remedy is that residents . . . will no longer be exposed to soil that poses a threat to human health. The land use of the properties will remain unchanged, and . . . will allow for the continued residential use of impacted yards.").) However, the EPA later changed course by advising the Plaintiffs to avoid leaving their homes or being outdoors. (*See* Compl. ¶ 17, Ex. 4.) The Mayor of East Chicago also advised them that "it is in your best interest to relocate your household[s] to safer conditions." (*See id.* ¶ 19, Ex. 5.) And the ECHA told the Plaintiffs that there were plans to demolish their homes and they must move by the end of November 2016. (*See id.* ¶ 21, Ex. 6.) Given these mixed messages from the many levels of government, the Plaintiffs sought professional assistance to assess and evaluate the hazardous substances in order to respond.

In reply, the Defendants argue that these materials belie any change in EPA policy. The "EPA has stated only that it has put work at the West Calumet Housing Complex temporarily on hold, and has done so not based on a change of its own analysis, but rather in reaction to relocation decisions made by" the ECHA and others. (Def. Atlantic Richfield's Reply 5–7.) As

the EPA's policy remains the same, the mixed messages of others do not entitle the Plaintiffs to recover response costs.

Based upon the allegations in the Complaint, it is plausible that the Plaintiffs' incurred investigative costs were not duplicative of the EPA's work. This is so especially in light of the varying messages that the Plaintiffs received in Summer 2016—one governmental actor advised them of hazardous substances in their homes that were not threatening, but then revised its stance and recommended they avoid the outdoors, while others warned them to relocate immediately. The fact that the Plaintiffs' own investigations occurred after they received notice that the EPA was remediating contamination does not render them duplicative. Rather, it appears that the governmental actors' statements allegedly confused the Plaintiffs as to the status of the remediation efforts, leading them to incur investigation costs different from the EPA's.

Because the determination that costs are "necessary" involves both questions of law and fact, the trier of fact may wait for a fuller record to make such a determination, such as on summary judgment or at trial. *See, e.g.*, *Wilson Rd. Dev. Corp.*, 209 F. Supp. 3d at 1114 (determining whether plaintiffs' response costs were "necessary" based upon the parties' proffered evidence); *Iron Mountain Mines*, 987 F. Supp. at 1272; *La.-Pac. Corp.*, 811 F. Supp. at 1245–46.[8] Accordingly, the record must be developed before the Court can determine whether, as a matter of law, the Plaintiffs' investigative costs were duplicative or not. At this stage, the

---

[8] The Complaint does not allege specific dollar values that the Plaintiffs incurred in their investigations, so the Court does not know what numerical amount the Plaintiffs have *actually* incurred. While not necessary on a motion to dismiss, specific dollar amounts will be useful at summary judgment because "[c]ourts deny recovery where the costs incurred are 'duplicative of other costs, *wasteful, or otherwise unnecessary* to address the hazardous substances at issue.'" *R.E. Goodson Const. Co. v. Int'l Paper Co.*, No. 4:02-4184, 2006 WL 4916336, at *25 (D.S.C. Dec. 15, 2006) (quoting *Waste Mgmt. of Alameda Cty., Inc. v. E. Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001)).

Court finds that the allegations in the Complaint plausibly state a claim for the recovery of investigative costs.[9]

**3.    *Relocation Costs***

The Defendants' final argument regarding the Plaintiffs' CERCLA claim is that the Plaintiffs are precluded from recovering relocation costs, because they are neither necessary nor consistent with the NCP. The NCP contemplates "temporary relocation" when it is "necessary to protect public health or welfare." 40 C.F.R. § 300.415(f).[10] Unlike investigation costs, the recovery of relocation costs requires "'[s]ubstantial compliance' with the NCP," *City of Gary v. Shafer*, 683 F. Supp. 2d 836, 853 (N.D. Ind. 2010) (citing *Norfolk S. Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 880 (N.D. Ill. 2001)), but "an immaterial or insubstantial deviation from the NCP will no[t] . . . be deemed inconsistent," *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 835 (8th Cir. 2000). The determination of "substantial compliance" with the NCP is made case-by-case, as "a significant deviation from procedures under one set of circumstances may be less serious in another." *R.E. Goodson Const.*, 2006 WL 4916336, at *31 (quoting 55 Fed. Reg. 8793–94, Mar. 8, 1990).

In support of their argument, the Defendants note that the EPA published five different remedial alternatives for the site in question, which were then put forth at public comment and at

---

[9] As the allegations regarding the Plaintiffs' investigation costs do not show that they were duplicative of the EPA's work and thus could have been "necessary," the Court need not make a finding as to whether the Plaintiffs incurred costs in compliance with the NCP. *See CNH Am., LLC*, 863 F. Supp. 2d at 809 ("[B]ecause any clean-up proposal and . . . clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary.'").

[10] "The costs of permanent relocation of residents and businesses and community facilities" are permissible only "where the President determines that . . . such relocation is more cost-effective than and environmentally preferable to transportation, storage, treatment, destruction, or secure disposition offsite of hazardous materials" 42 U.S.C. § 9601(24). In their Opposition briefing, the Plaintiffs conceded that they only seek costs related to temporary relocation, not permanent relocation. (Pls.' Mem. in Opp'n to Defs.' Mots. Dismiss 11–13.) Accordingly, the Court confines its analysis to temporary relocation costs.

public hearings. Ultimately, the EPA's remediation plan was selected because it "reduc[ed] exposure of residents to contaminated soils that pose[d] a health risk through the removal and off-site disposal of those soils, and allow[ed] for the continued residential use of impacted residential properties" within the zone. (Def. Atlantic Richfield's Mem. 10 (citing R. of Decision § 2.12).) Part of the EPA's remediation plan included approximately one week of temporary relocation costs for those residents whose homes were "potentially contaminated with lead and/or arsenic dust" and needed to be cleaned. (Per Diem Notification Letter 1, ECF No. 41-9.) The plan did not provide for permanent relocation of the residents. Accordingly, the Defendants contend that the Plaintiffs' requested relocation costs are not necessary or consistent with the NCP because they are duplicative of those provided for in the EPA's remediation plan.

Again, the Plaintiffs' argument relies upon those governmental entities' divergent messages from Summer 2016, discussed above. In light of that confusion, the Plaintiffs argue that they "acted in substantial compliance with the NCP in seeking temporary relocation." (Pls.' Opp'n 11.) Additionally, the Plaintiffs assert that there is no case authority barring private parties from recovering their response costs after the EPA chooses a remediation plan or recovering response costs unrelated to the EPA's interim actions. Finally, the Plaintiffs argue that the EPA is considering abandoning the 2012 Record of Decision in light of these external actions by other governmental entities, which would render any of the Plaintiffs' response costs authorized under the NCP and entitle them to recovery.[11] (*See* U.S.'s Opp'n to Mot. Intervene 9, ECF No. 41-8 ("[I]f the City changes the use [of West Calumet] from residential to commercial or industrial, EPA may have to modify the selected remedy. . . . This would require an amendment to the [Record of Decision], complete with an opportunity for public comment.").)

---

[11] The Defendants contested this reading of the EPA's statements as authorizing the recovery of response costs, which the Court elaborated above.

The allegations in the Complaint plausibly state a claim for the recovery of temporary relocation costs. It is true that the EPA's Per Diem Notification Letter contemplates temporary relocation costs, which would seemingly render the Plaintiffs' costs duplicative. However, three factual allegations, when considered together, suggest that the Plaintiffs' relocation costs are "necessary": (1) the EPA's plan to provide temporary relocation costs when it cleaned the inside of contaminated residences; (2) the EPA's changing statements that could be interpreted as its revisiting of its previously chosen remedial plan; and (3) those warnings of impending demolition and the need to relocate that came from local entities. In light of these factual allegations, the Court finds that the Plaintiffs allege substantial compliance with the NCP in seeking to relocate because it is plausible that they believed the government wanted them to leave West Calumet. While the EPA did not request FEMA to relocate the Plaintiffs, as required under § 300.415(f), any deviation by the Plaintiffs from the federal regulations in this regard could be considered insubstantial. *See R.E. Goodson Const.*, 2006 WL 4916336, at *34 ("To preclude [plaintiff's] recovery on the basis of noncompliance with the NCP would defeat cost recovery . . . based on a mere technical failure and ignore the equitable component that Congress and EPA built into cleanup cost decisions.") (quotation marks omitted); *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 752 (D. Md. 2001). It may be the case that the evidence will show that some of these factual allegations are inaccurate, or that it was unreasonable for the Plaintiffs to have relied upon them in seeking to relocate. But at this stage of the proceedings, the Court is not tasked with resolving factual questions. All the Court must decide is whether there are enough facts to put the Defendant on reasonable notice as to the nature of the Plaintiffs' claims and to allow the Court "to draw the reasonable inference that the [D]efendant[s are] liable

for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citation omitted). The Court finds that the Complaint does just that.

Accordingly, the Court denies the Defendants' Motions to Dismiss the Plaintiffs' CERCLA Section 107(a) Claim for Cost Recovery.

## C.    State Law Claims

The Plaintiffs have pled claims under Indiana law for nuisance and negligence. The Defendants' Motions[12] present four arguments as to why this Court should dismiss the Plaintiffs' state law claims. First, the state law claims are barred by the statute of limitations. Second, the Plaintiffs are barred from double recovering for the same injury under their CERCLA and state law claims. Third, the Defendants cannot be held liable under a theory of nuisance. Fourth, the Defendants owed no duty to the Plaintiffs and the Complaint fails to allege causation.

### 1.    *Statute of Limitations*

Whether the Plaintiffs' state law claims involve personal injury or property damage, Defendant DuPont argues that the Plaintiffs' claims are barred by the statute of limitations. An action for personal injury must commence within two years of the time the cause of action accrues, Ind. Code § 43-11-2-4, and an action for property damage must commence within six years of the time the cause of action accrues, *Id.* § 34-11-2-7(3). Once "a claimant knows or in the exercise of ordinary diligence should have known of the injury," the limitations period begins to run. *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009); *see also McFarland Foods Corp. v. Chevron USA, Inc.*, No. IP 99-1489, 2001 WL 238084, at *3 (S.D.

---

[12] Both Defendants filed separate Motions to Dismiss the Plaintiffs' state law claims, joining in some of the same arguments. Where appropriate, the Court considers an argument raised in one Defendant's Motion as applicable to the other Defendant as well.

Ind. Jan. 5, 2001). "[A] motion to dismiss based on [the] failure to comply with the statute of

limitations should be granted only where the allegations of the complaint itself set forth

everything necessary to satisfy the affirmative defense." *Chi. Bldg. Design P.C. v. Mongolian

House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) (quoting *United States v. Lewis*, 411 F.3d 838,

842 (7th Cir. 2005)).

Offering ample evidence from the public record, Defendant DuPont argues that the

Plaintiffs knew or should have known of West Calumet contamination more than six years

before bringing their claims. In March 2006, the EPA started its public cleanup efforts at the

USS Lead Site (*See* EPA Press Release Mar. 2006 1–2, ECF No. 43-6.) In October 2007, the

Indiana Department of Environmental Management (IDEM) and the EPA released a fact sheet

on the cleanup at the Site. (*See* Fact Sheet Oct. 2007 1–4, ECF No. 43-7.) Then in June 2008, the

EPA sent a postcard to residents in the neighborhood that it was "working . . . to remove lead-

contaminated soil from some yards." (*See* EPA Postcard June 2008, ECF No 43-8.) A newspaper

advertisement ran on May 23, 2010, which stated that the EPA "would like to schedule

interviews with residents to talk about the lead contamination in the neighborhood yards." (*See*

Newspaper Advertisement May 2010, ECF No. 43-10.) In April 2011, the EPA prepared a

Community Involvement Plan to "promot[e] communication between citizens and the Agency."

(*See* Cmty. Involvement Plan 1-1, ECF No. 43-11.) Finally, the EPA published notice of its

proposed remediation plan for the USS Lead Site in local publications on July 12, 2012, solicited

public comments by mailing its fact sheet to area residents, and then held a public meeting at the

East Chicago Public Library regarding the plan on July 25, 2012. (Consent Decree ¶ I.J 2; *see

also* EPA Press Release July 2012 2–6, ECF No. 43-14.) For their part, the Plaintiffs argue that

their claims are not barred under Seventh Circuit precedent. They argue that none of the factual

allegations in the Complaint itself show that the Plaintiffs "clearly had notice of their claims outside of the limitations period." (Pls.' Opp'n 25.)

The Court does not find that this evidence put forth by Defendant DuPont shows that the Plaintiffs' causes of action accrued outside the statute of limitations period. The evidence that Defendant DuPont attached to its Motion all relates to the EPA's plan in 2012. At that time, the Plaintiffs were notified that there would be a clean-up in their community and that EPA was organizing it. However, the Plaintiffs were under the impression that the clean-up would not impact their homes or require them to move. Although the Plaintiffs knew as early as 2012 that the Defendants' conduct was the reason for the clean-up, they did not know or have reason to suspect that the Defendants' conduct had harmed them in any tangible way. Indeed, the EPA's statement that "residents . . . will no longer be exposed to soil that poses a threat to human health," and that "land use of the properties will remain unchanged" as a result of its remediation, all support this assumption of the Plaintiffs. (R. of Decision 49.)

But, that all changed in the Summer of 2016, when the Plaintiffs received different messages from governmental entities. One governmental actor advised them of hazardous substances on their properties, but then subsequently advised them to try to stay indoors, while others warned them that they had to relocate immediately, and that the EPA's "work is on hold" until there is more clarity with regard to the situation. (U.S.'s Opp'n to Mot. Intervene 9.) It appears that this confusion could have been because the contamination of lead and arsenic at West Calumet was greater than previously anticipated, necessitating changes to the government's response. (*Compare* R. of Decision 48–49 (explaining that EPA's remediation plan will "reduc[e] exposure of residents to contaminated soils that pose a health risk . . . , and allow[] for the continued residential use of impacted residential properties"), *with* Compl. ¶ 17, Ex. 4

24

(increasing restrictions on home usage during remediation plan), *id.* ¶ 19, Ex. 5 ("Now that we know the levels of lead in the ground in West Calumet Housing Complex, we feel it is in your best interest to temporarily relocate your household to safer conditions.").) As such, the Plaintiffs only discovered how and how much the Defendants' conduct had harmed them—by incurring costs to investigate the contamination, "arrang[ing] for alternative temporary housing and relocations," and fearing future injuries from greater-than-anticipated levels of exposure—in Summer 2016, after the relevant authorities notified them. (Compl. ¶¶ 22–23.)

Furthermore, the allegations on the face of the Complaint do not clearly show that the Plaintiffs "knew, or reasonably should have known" that they accrued nuisance and negligence claims against the Defendants outside of the statute of limitations period. For the Court to make such a determination at this stage would require a factually intensive endeavor, and thus inappropriate for a motion to dismiss. *See, e.g.*, *Bernstein v. Bankert*, No. 1:08-CV-427, 2010 WL 3893121, at *4–9 (S.D. Ind. Sept. 29, 2010) (resolving at the summary judgment stage when the plaintiffs had knowledge of federal and state environmental claims); *McFarland Foods Corp.*, 2001 WL 238084, at *3–7 (same); *see also 766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.*, 249 F. Supp. 2d 974, 988 (N.D. Ill. 2003) (denying motion to dismiss federal securities claim because "inquiry notice is often a question of fact").

## 2.    *Duplicative Damages*

Defendant DuPont argues that the Plaintiffs' state law claims should be dismissed because they seek to recover duplicative damages. If they pursue both CERCLA claims and state law claims, Defendant DuPont argues that the Plaintiffs should not be allowed a double recovery. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir. 1998); *Ashtabula River Corp. Grp. II v. Conrail, Inc.*, 549 F. Supp. 2d 981, 985–86 (N.D. Ohio 2008). The damages alleged in the

Complaint are to redress the Plaintiffs' "'stress, aggravation, annoyance, inconvenience, and discomfort,' as well as 'time and money to respond to the releases of lead and arsenic, including but not limited to, investigating the nature of release and making arrangements for alternative temporary housing and relocations.'" (Def. DuPont's Mem. 12 (quoting Compl. ¶ 22).)

In opposition, the Plaintiffs argue that they are (1) alleging specific damages not requested under CERCLA in their common law claims and (2) the "damages award that [they] ultimately *recover* has no bearing on whether or not [they] may pursue several causes of action for the same allegedly wrongful conduct that leads to the same injuries." (Pls.' Opp'n 23.)

> Under Federal Rule of Civil Procedure 8(d),
>
> A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient. . . .
>
> A party may state as many separate claims or defenses as it has, regardless of consistency.

Fed R. Civ. P. 8(d)(2)–(3). Thus, the Plaintiffs' argument correctly states the law and Defendant DuPont's case authority is not to the contrary. *Bedford Affiliates* considered and held that "CERCLA preempts the state law remedies of restitution and indemnification," but held nothing as to whether a plaintiff may allege alternative damages in a complaint. 156 F.3d at 426. And in *Ashtabula River*, the court stated that, "Where a plaintiff's set of damages recoverable under § 107 are not identical to the set of damages recoverable under state law, the causes of action are not seeking double recovery and the state law claims are not preempted." 549 F. Supp. 2d at 986. The Plaintiffs' Complaint alleges distinct damages—cost recovery under CERCLA, and individual injury to their persons from potential exposure to hazardous substances under their common law claims. As such, this Court distinguishes *Ashtabula River*, as many others have.

*See, e.g.*, *Bd. of Cty. Comm'rs of Cty. of La Plata, Colo. v. Brown Grp. Retail, Inc.*, 598 F. Supp. 2d 1185, 1193 (D. Colo. 2009) ("I decline to follow the *Ashtabula River* decision and deny [defendant's] motion to dismiss [p]laintiff's unjust enrichment claim."); *Lockheed Martin Corp. v. United States*, 664 F. Supp. 2d 14, 19 (D.D.C. 2009) (distinguishing *Ashtabula River*, among other cases); *see also Tarob M & C Investors, LLC v. Herbert*, No. 5:14-CV-4291, 2015 WL 5728426, at *3 (N.D. Cal. 2015) (noting a "split [of authority] as to whether plaintiffs [may] alleg[e] both CERCLA claims and related state law claims" but "[t]he Federal Rules of Civil Procedure ultimately control, and Rule 8 allows alternative pleading").

Here, the Plaintiffs have followed the Federal Rules in setting forth their damages allegations in the Complaint. Accordingly, their state law claims are not subject to dismissal.

### 3.    *Count II—Nuisance*

Under Indiana law, a nuisance exists if something "is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property." Ind. Code § 32-30-6-6. A claim for nuisance "provides a mechanism for resolving conflicts between competing, simultaneous uses of nearby property by different landowners." *Lilly Indus.*, 974 F. Supp. at 706. Because the Defendants allegedly owned and operated two separate facilities at different locations in East Chicago, the Plaintiffs' alleged nuisance claims differ as to each. Accordingly, the Defendants moved for dismissal of the Plaintiffs' nuisance claims on different grounds.

### a.    *Nuisance Claim Against Defendant Atlantic Richfield*

Defendant Atlantic Richfield argues that the Plaintiffs' nuisance claim fails because that tort was not intended to allow subsequent users of contaminated property to sue prior owners

because "a property owner owes no duty under the law of nuisance to later purchasers of the property." *Lilly Indus., Inc. v. Health-Chem Corp.*, 974 F. Supp. 702, 706 (S.D. Ind. 1997) (citing *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985)).[13] It offered a wealth of case authority from Indiana and other jurisdictions favorably citing the proposition that a subsequent user of contaminated property is barred from suing the prior owner. *See Sanyo N. Am. Corp. v. Avco Corp.*, No. 1:06-CV-405, 2008 WL 2691095, at *7 (S.D. Ind. July 3, 2008) (holding that Indiana nuisance law only "provides a mechanism for resolving conflicts between competing, simultaneous uses of nearby property by different landowners," not "between buyer and seller of the same property"); *City of Gary v. Shafer*, No. 2:07-CV-56, 2007 WL 3019918, at *5 (N.D. Ind. Oct. 4, 2007) ("It is well-settled law in Indiana that a purchaser of land cannot sue a prior owner for nuisance."); *Wickens v. Shell Oil Co.*, No. 1:05-CV-645, 2006 WL 3254544, at *6 (S.D. Ind. Nov. 9, 2006) (same); *McFarland Foods Corp. v. Chevron USA, Inc.*, No. IP 99-1489, 2000 WL 684265, at *2 (S.D. Ind. May 16, 2000) (same); *see also Moore v. Texaco, Inc.*, 244 F.3d 1229, 1232–33 (10th Cir. 2001) ("[A]n action for private nuisance is designed to protect neighboring landowners from conflicting uses of property, not successor landowners from conditions on the land they purchased."); *Metro. Water Reclamation Dist. of Greater Chi. v. Lake River Corp.*, 365 F. Supp. 2d 913, 918–19 (N.D. Ill. 2005) (noting that historically, "the purpose of private nuisance law [w]as . . . to resolve conflicts between neighboring, contemporaneous landowners," not "claims between current and former owners of the same property" or ones "involving a lessor/lessee").

---

[13] Defendant Atlantic Richfield's argument focuses primarily on any claim for "private" nuisance because the Plaintiffs' allegations fail to mention any public or common right, instead alleging just individual interferences with their private property use. The Court does not find that there is a plausible claim for "public" nuisance and so confines its analysis accordingly.

The predecessors to Defendant Atlantic Richfield lawfully operated their businesses, which involved the use of the alleged hazardous substances at West Calumet, and subsequently sold the property. "All of this happened decades ago, long before any residential buildings were contemplated at the site." (Def. Atlantic Richfield's Mem. 15.) Now that there are homes at the West Calumet site, and the ECHA manages them, "Plaintiffs seek to . . . hold liable the prior owner of the land in which they now possess an interest (as renters through contracts with the Housing Authority) simply for that prior owner's use of the land." (*Id.*) Defendant Atlantic Richfield argues that this situation extends beyond the reach of nuisance law.

The Plaintiffs concede that they never purchased or owned the polluted property. Nevertheless, they argue that there is no authority, either under federal or Indiana law, preventing tenants on a property from "recover[ing] for a nuisance created by the property's prior owner." (Pls.' Opp'n 15.) They cite multiple cases in support of their position. *Reed v. Reid*, 980 N.E.2d 277, 294 (Ind. 2012); *City of Gary v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1233 (Ind. 2003); *Gray v. Westinghouse Elec. Corp.*, 624 N.E.2d 49, 53 (Ind. Ct. App. 1993).

However, the Court's review of those authorities does not show that they support the Plaintiffs' argument. First, *Reed* merely recites the required elements in a nuisance claim and nowhere authorizes a cause of action for tenants against that property's prior owner. Second, *Smith & Wesson* assessed the types of contexts in which a public nuisance claim arises, but Plaintiffs have failed to allege any facts showing a public nuisance. Finally, *Gray* did state that "[a]lthough most nuisance cases refer to the controversy as being between two landowners, it is because this is the norm, not because the law requires either party to be a landowner." 624 N.E.2d at 53. Nonetheless, this language is mere dicta. Indeed, the facts of *Gray* distinguish it from the present case: the plaintiffs *owned* the property that was subject to the prior owner's

29

nuisance (which was the defendant), and the latter argued that "a defendant in a nuisance action must own or control the property on which the nuisance is located" in order to be liable. *Id.* The actual holding of *Gray*—"that the party which causes a nuisance can be held liable, regardless of whether the party owns or possesses the property on which the nuisance originates"—was only reached because the *Gray* plaintiffs owned the property. *See id. Gray* says nothing about whether tenants of property may sue a prior owner of that property for nuisance.

The overwhelming weight of authority in Indiana supports Defendant Atlantic Richfield's position. A later purchaser of property cannot sue a prior owner of that same property for nuisance, as the latter owes no duty to the former. *See Sanyo N. Am. Corp.*, 2008 WL 2691095, at *7; *Shafer*, 2007 WL 3019918, at *5; *Wickens*, 2006 WL 3254544, at *6; *McFarland Foods Corp.*, 2000 WL 684265, at *2. That the Plaintiffs are currently tenants does not change the law. Accordingly, the Plaintiffs have failed to state a claim for nuisance against Defendant Atlantic Richfield.

b.     *Nuisance Claim Against Defendant DuPont*

Defendant DuPont argues that the Plaintiffs' claim for nuisance fails for multiple reasons: first, any contamination of the Plaintiffs' property ceased years ago and is no longer "ongoing"; second, any nuisance to the Plaintiffs is at the West Calumet site, and DuPont may not be sued for any nuisance that the Plaintiffs experience there; third, Indiana's "coming to the nuisance statute" precludes any cause of action; and fourth, the allegations in the Complaint insufficiently plead harm. (Reply in Supp. of Def. DuPont's Mot. Dismiss 7–9, ECF No. 51.)

In opposition, the Plaintiffs argue that it is irrelevant at what time Defendant DuPont's contamination ceased. Indiana courts have recognized "that a very common delay between polluting conduct and discovery of its latent impact is a precise reason why today's

environmental law looks 'backwards,' to impose responsibility on those who caused the

pollution." *See KB Home Ind. Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 306 (Ind. Ct. App.

2010). Furthermore, they argue that they have adequately alleged a nuisance claim because the

Defendants' pollution is injurious to their health, test results show that hazardous substances are

at dangerously high levels, and contamination from hazardous substances has interfered with

their way of life. (*See* Compl. ¶¶ 12, 14, 17, 21.)

Both parties rely upon *KB Home* to support their opposing positions. In *KB Home*, the

plaintiff property developer sued the owners of a neighboring property for nuisance. "Between

1969 and 1990," an airplane parts manufacturer disposed of chemical contaminants on what

would become the defendant's property that "ultimately leached into the surrounding

environment." 928 N.E.2d at 300–01 (internal quotation marks omitted). Eventually, the plaintiff

property developer purchased neighboring land parcels and began to develop them into

subdivisions. *Id.* at 301. It was not until 2005 that the plaintiff became aware of the groundwater

contamination, when "it conducted an environmental investigation," although by that time "the

subdivision contain[ed] empty lots scattered among finished and occupied homes." *Id.* at 302.

The defendant moved for summary judgment on the nuisance claim, arguing that "it could not

have foreseen any harm to [the plaintiff] at the time of the conduct that allegedly caused the

nuisance," and that the parties "did not simultaneously own or use their properties." *Id.* at 303.

The appellate court did find that the harm that the plaintiffs experienced from

groundwater contamination was foreseeable. *See id.* at 306–07. However, the court noted that

"[a] nuisance claim generally contemplates an action that is designed to cease or lessen the

defendant's *continued* offensive behavior." *Id.* at 307 (emphasis added). Based upon the parties'

evidence at summary judgment, the defendant's "contamination of the property ceased in 1993

. . . . Thus, [the plaintiff] . . . failed to show that a nuisance existed or was ongoing that could be abated or enjoined." *Id.*[14]

The Court finds that *KB Home* is persuasive. In their Complaint, the Plaintiffs only allege that Defendant DuPont's "contamination occurred and persists" (Compl. ¶ 43), not that any contamination is ongoing at present. Indeed, the evidence available in the public record shows that Defendant DuPont stopped producing lead and arsenic compounds at its site in 1949. (*See* RCRA Corrective Action Order 1997 at 19, ECF No. 52-2.) The amount of time between 1949 and when the Plaintiffs occupied this land is far greater than that which elapsed in *KB Home*. 928 N.E.2d at 307. Accordingly, Indiana case precedent and the allegations in the Plaintiffs' Complaint lead to the conclusion that their claim for nuisance against Defendant DuPont fails.[15]

### 4.    *Count III—Negligence*

In Indiana, "[t]he essential elements for a negligence action are (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014) (quotation marks omitted). To determine whether a duty exists, a court must balance "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Id.* "[T]he foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 390 (Ind. 2016). Because the Defendants allegedly owned and operated two separate facilities at different locations in East

---

[14] The *KB Home* Court noted that, because "the damage ha[d] already been done" to the plaintiff, their "cause of action against [the defendant] sound[ed] in negligence," not nuisance. *Id.*

[15] Because the Court finds that there is no nuisance that is currently "ongoing," the Court declines to consider those other bases upon which Defendant DuPont moved to dismiss the Plaintiffs' claim for nuisance.

Chicago, the Plaintiffs' alleged negligence claims differ as to each. Accordingly, the Defendants moved for dismissal of the Plaintiffs' negligence claims on different grounds.

a.      *Negligence Claim Against Defendant Atlantic Richfield*

Defendant Atlantic Richfield argues that the Plaintiffs' claim for negligence must fail because, under Indiana's foreseeability test, "[a] prior owner-defendant that long ago allegedly contaminated industrial property owes no duty under Indiana law to a plaintiff that now resides on the land." (Def. Atlantic Richfield's Mem. 17.) The Southern District of Indiana has held that imposing a duty upon a landowner to "maintain his or her property in a certain condition or to refrain from any activity affecting the property which would extend to future owners of the land" is unreasonable for two reasons. *Wickens v. Shell Oil Co.*, 2006 WL 3254544, at *7 (quoting *Wellesley Hills Realty Tr. v. Mobil Oil Corp.*, 747 F. Supp. 93, 100 (D. Mass. 1990)). First, "such future owners may not be known or even contemplated at the time the landowner creates or maintains a condition on his or her property." *Id.*; *see also Sanyo N. Am. Corp.*, 2008 WL 2691095, at *5 ("[I]t is unreasonable to hold a prior landowner responsible in tort for actions taken approximately forty years before the current owner acquired the land."). Second, "such a duty would unreasonably interfere with a landowner's right of ownership." *Wickens*, 2006 WL 3254544, at *7. [16]

---

[16] An exception to this general rule arises in limited circumstances:

> [A] vendor is under a duty to a vendee to disclose any hidden defects which he knows or should know would create an unreasonable risk of harm to persons on the premises. If the vendor fails in this duty, he or she would be liable for any resulting harm to the vendee or others upon the land.

*Wellesley Hills Realty Tr.*, 747 F. Supp. at 100 (citing Prosser and Keaton on the Law of Torts § 64, at 447 (5th ed.).

Applying this rule to the present Motion, Defendant Atlantic Richfield notes that there are no allegations that either it or its predecessor owners of the West Calumet land had any relationship to the Plaintiffs. The local government developed the former lead and arsenic site into a public housing complex after having purchased it from a private seller, the latter having purchased it from Defendant Atlantic Richfield. Furthermore, there are no allegations that Defendant Atlantic Richfield concealed or failed to disclose to the purchasers of the property the fact that the site may have been contaminated by lead or arsenic.

In response, the Plaintiffs assert that Defendant Atlantic Richfield owed them a duty because the Plaintiffs' injuries were foreseeable. *Goodwin*, 62 N.E.3d at 390. As the handler of hazardous substances, the Defendant "owed a duty to handle those substances with reasonable care because it was foreseeable that their mishandling could injure residents of" West Calumet. (Pls.' Opp'n 19.)[17] Additionally, the Plaintiffs distinguish *Wickens* by relying upon their status as tenants at West Calumet, which meant that they "had no ability to negotiate with the previous owners or receive compensation for the hazardous contamination to which they have been exposed because of the previous owner's negligence." (*Id.* 21.)

Much like the nuisance action, the Court finds that Indiana law precludes the Plaintiffs' claim against Defendant Atlantic Richfield for negligence. Based upon the allegations of the Complaint regarding Defendant Atlantic Richfield's operation of the West Calumet Site, none of the three factors for finding a duty are present. First, there was no relationship between the Plaintiffs and Defendant Atlantic Richfield, as it was not reasonably foreseeable that the land would be converted into a residential housing complex at the time that Defendant Atlantic

---

[17] The Plaintiffs assert that because Defendant Atlantic Richfield "abandon[ed] the property in a contaminated state, it is foreseeable that future residents, like Plaintiffs, may come into contact with the contaminated soil." (*Id.* 20.) There are no allegations in the Complaint that Defendant Atlantic Richfield "abandoned" the property upon which West Calumet was built, so such an argument is without merit.

Richfield was operating its plant there. Second, as it was unclear that tenants would reside there in the future, it was not reasonably foreseeable that Defendant Atlantic Richfield's conduct would cause harm to West Calumet tenants decades later. Third, public policy does not weigh in favor of holding Defendant Atlantic Richfield to a duty to future, unknown possessors of its own land. *See Sanyo N. Am. Corp.*, 2008 WL 2691095, at *5; *Wickens*, 2006 WL 3254544, at *7.

Accordingly, the Plaintiffs have failed to state a claim for negligence against Defendant Atlantic Richfield.

b.    *Negligence Claim Against Defendant DuPont*

Defendant DuPont presents two grounds for dismissing the negligence claim against it. First, it takes issue with the allegations in the Complaint by arguing that they are conclusory, made collectively against both Defendants, and do not suggest a legal theory of duty because they had no relationship to the Plaintiffs. Second, Defendant DuPont argues that the Plaintiffs have failed to plead a "but for" causal connection between them and an injury to the specific Plaintiffs. Under Indiana law, proximate causation requires both "factual causation" and "legal causation." *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841, 853 (N.D. Ind. 2004); *see also Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 445 (7th Cir. 2009) ("Courts remain entirely free to dismiss a claim . . . where the pleadings do not permit a reasonable inference of proximate cause."). Because it never operated on the site where West Calumet is located (*see* R. of Decision 7–8), Defendant DuPont insists that the Plaintiffs have not alleged facts sufficient to show that its conduct caused their injuries.

In opposition, the Plaintiffs argue that their allegations sufficiently show that Defendant DuPont owed them a duty and that it proximately caused their injuries. Whereas the Plaintiffs reside on the same property that Defendant Atlantic Richfield once owned, their relationship to

Defendant DuPont is different. Defendant DuPont's plant *neighbored* the property upon which the Plaintiffs live, and thus it "owed a duty to exercise reasonable care when handling the hazardous materials in order to prevent contamination from leaving its property." (Pls.' Opp'n 22.) Furthermore, Defendant DuPont's contamination need not have been *the* proximate cause, but only *a* proximate cause, of the Plaintiffs' injuries to succeed on a claim for negligence. *See Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010).

The Plaintiffs' claim for negligence against Defendant DuPont should not be dismissed at this stage. The Plaintiffs are correct in arguing that Defendant DuPont's contamination only must be a proximate cause, and the Court finds that the allegations plausibly suggest that Defendant DuPont may be a proximate cause of the allegedly negligent contamination of the property upon which West Calumet was built. Unlike Defendant Atlantic Richfield's operation of its facility, the allegations in the Complaint plausibly suggest that Defendant DuPont owed a duty to the Plaintiffs. First, the parties stand in a relationship as possessors of interests in neighboring properties. Second, it was reasonably foreseeable that Defendant DuPont's alleged conduct could harm the neighboring property, and any possessor's interest therein. *See KB Home*, 928 N.E.2d at 305–06 (finding that a formerly neighboring property owner could be sued for "negligent conduct that may have caused the contamination" on the plaintiffs' property, even though the plaintiffs "did not contract with [defendant] to purchase property or a product"). At the very least, the Court finds that this inquiry will be tied up with the analysis of causation, and thus requires a more factually intensive inquiry. Finally, public policy favors the protection of property rights and prevention of unwanted harm to property.

Accordingly, the Plaintiffs have plausibly stated a claim for negligence against Defendant DuPont.

**D.    Required Parties**

Defendant DuPont separately moved under Rule 12(b)(7) to dismiss the Plaintiffs'

Complaint for failure to join required parties. Despite being the master of the complaint, a

plaintiff must join all of the required parties to an action, and a party is "required" if:

> (A) in that person's absence, the court cannot accord complete relief among
> existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so
> situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the
>> interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double,
>> multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "If a person who is required to be joined if feasible cannot be joined, the

court must determine whether, in equity and good conscience," to allow the action to "proceed

among the existing parties or . . . be dismissed." *Id.* 19(b). The Rules list four factors that a court

should consider in determining whether and how to proceed. *See id.* 19(b)(1)–(4) (listing factors

of "prejudice" to the remaining parties, options for the court to lessen such prejudice, "whether a

judgment . . . would be adequate" absent the party, and "whether the plaintiff would have an

adequate remedy if the action were dismissed"). "The Rule 19 inquiry is a context sensitive one

which may vary from case to case." *Two Shields v. Wilkinson*, 790 F.3d 791, 798 (8th Cir. 2015)

(citing *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)).

In support of its Rule 12(b)(7) Motion, Defendant DuPont argues that the Complaint must

be dismissed because the EPA, IDEM, and ECHA, are all required parties under Rule 19.[18] In

---

[18] The Motion refers to "necessary parties," which was used in a previous iteration of the Federal Rules. There is no substantive distinction between "necessary" and "required" parties, so the Court uses the current styling of the Federal Rules.

support, Defendant Dupont suggests that the Plaintiffs cannot obtain complete relief without these governmental entities, as the ECHA made the relocation decision in Summer 2016, while both the EPA and IDEM agreed to pay for cleanup of the neighborhood previously. As required parties, the EPA, IDEM, and ECHA, allegedly cannot be joined because they are governmental entities immune from suit. Accordingly, Defendant DuPont asserts that a balancing of the four factors favors dismissal because the Defendants would be unduly prejudiced, as they would be subject to both a monetary judgment for Plaintiffs and "EPA and IDEM's direction regarding cleanup of contamination in East Chicago." (Def. DuPont's Mem. 16.)[19]

In opposition, the Plaintiffs argue that the Complaint does not lack required parties for multiple reasons. First, they are seeking monetary damages under a statute that imposes joint-several liability upon liable parties. Accordingly, they may seek recovery of any and all of their damages against any party and are not obligated to name all possibly liable actors. *Metro. Water Reclamation Dist. v. N. Am. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007) ("[B]y invoking § 107(a), the [plaintiff] may recover its costs in full from any responsible party, regardless of that party's fault."); *see also Temple v. Synthes*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."). Second, it is irrelevant for purposes of determining Defendant DuPont's liability whether or not the governmental entities can be joined, as it can still present the same arguments and defenses regarding its liability whether or not the governmental entities are in the action.

---

[19] Specifically, Defendant Dupont argues that it would be "[i]nherently unfair (1) to hold Moving Defendants liable for any action or inaction that occurred at the direction of EPA and IDEM . . . ; and (2) to impose further monetary obligations on Moving Defendants that are not coordinated with the pending remedial actions overseen by EPA and IDEM." (Def. DuPont's Mem. 14.) Furthermore, proceeding without the governmental entities will put Defendant DuPont "at risk of inconsistent obligations given that EPA and IDEM are already overseeing the remediation . . . and Moving Defendants are required to comply with the directives of those agencies." (*Id.*)

And finally, because the Plaintiffs do not seek injunctive relief, any damages award will not frustrate Defendant DuPont's ability to comply with governmental agency directives.

The Court does not find that the EPA, IDEM, and ECHA, are required parties under Rule 19. Initially, the Court notes that the governmental entities could only be required parties to the Plaintiffs' CERCLA claim. Because the plaintiff in a CERCLA action "may recover its costs in full from *any* responsible party," *Metro. Water Reclamation Dist.*, 473 F.3d at 827 (emphasis added), the court will be able to accord "complete relief" in the event that the Defendants are found liable, Fed. R. Civ. P. 19(a). Just because the governmental entities have made policy determinations specific to the remediation efforts at the USS Lead Site does not make them "required" for purposes of the Plaintiffs' CERCLA and state law claims. Rather, the theories of recovery and relief that the Plaintiffs seek are unique to the Defendants. Having determined that the EPA, IDEM, and ECHA, are not required parties, the Court need not balance the four factors enumerated in Rule 19. Dismissal pursuant to Rule 12(b)(7) is unwarranted in this case.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Atlantic Richfield Company's Motion to Dismiss [ECF No. 39], **GRANTS IN PART** and **DENIES IN PART** Defendants E.I. du Pont de Nemours and Company, and the Chemours Company's Amended Motion to Dismiss [ECF No. 45], **TERMS** the Defendants' Motions for Judicial Notice [ECF Nos. 41, 44], and **DENIES** the Plaintiffs' Motion to Certify Class [ECF No. 4] with **LEAVE TO REFILE** based upon the claims remaining after this Order. Specifically, the Court:

(1)    **DENIES** the Defendants' Motions to Dismiss as to the Plaintiffs' CERCLA Section 107(a) Claim for Cost Recovery;

(2)    **GRANTS** Defendant Atlantic Richfield Company's Motion to Dismiss as to the Plaintiffs' nuisance and negligence claims against it;

(3)    **GRANTS** Defendants E.I. du Pont de Nemours and Company, and the Chemours Company's Amended Motion to Dismiss as to the Plaintiffs' nuisance claim against them; and

(4)    **DENIES** Defendants E.I. du Pont de Nemours and Company, and the Chemours Company's Amended Motion to Dismiss as to the Plaintiffs' negligence claim against them.

SO ORDERED on July 26, 2017.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT