# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| LERITHEA ROLAN, and LAMOTTCA BROOKS, Individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | CAUSE NO.: 1:16-cv-357-HAB-SLC |
| ATLANTIC RICHFIELD COMPANY, E.I. DU PONT DE NEMOURS AND COMPANY, and THE CHEMOURS COMPANY, | |
| Defendants. | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Amended Motion and Incorporated Memorandum for Class Certification [ECF No. 129], filed by Plaintiffs Lerithea Rolan and Lamottca Brooks. Plaintiffs were residents of East Chicago, Indiana, living in the West Calumet Public Housing Complex (the "West Calumet Housing Complex") in 2016 when the Environmental Protection Agency (the "EPA") warned them of dangerous levels of lead and arsenic in the soil where they lived. Plaintiffs bring this matter as a class action on behalf of themselves and other former residents of the West Calumet Housing Complex, alleging that each was forced to relocate from his or her home as a result of lead and arsenic contamination caused by Defendants Atlantic Richfield Co., E.I. du Pont Nemours and Company, and The Chemours Company.

**STATEMENT OF FACTS**

The West Calumet Housing Complex was located in what became designated as the USS Lead Superfund Site, which became the subject of a Consent Decree approved by a federal district court in 2014 that resolved Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims brought by the United States and the State of Indiana with respect to the USS Lead Superfund Site. *See United States v. Atlantic Richfield Co., et al.,* No. 2:14-CV-312-PPS-PRC (N.D. Ind. Oct. 28, 2014). The West Calumet Housing Complex was designated as "Zone 1" of Operable Unit One ("OU1") within the larger USS Lead Superfund Site. It had been built on the former Anaconda Copper Company site, Atlantic Richfield's alleged predecessors-in-interest. Adjacent to OU1 is Operable Unit Two ("OU2"), which marks the location of the former USS Lead facility.

**A.     Industrial Operations in East Chicago**

A number of companies operated in the vicinity of the Superfund Site. The USS Lead facility operated as a primary lead smelter from its construction in the early 1900s until its conversion into a secondary lead smelter in the early 1970s. USS Lead discontinued operations at the site in 1985. USS Lead spread blast-furnace slag over an adjoining wetland area and some lead-containing dust migrated to OU1 by wind. In 1993, USS Lead began a cleanup at its facility under an agreement with the EPA.

Atlantic Richfield is the corporate successor to the entities that operated on the site that, in the early 1970s, became the West Calumet Housing Complex. Atlantic Richfield's alleged predecessors-in-interest had engaged in industrial activities on the same site,

which included operating a white lead plant at the site from 1919 to 1946, a lead refinery from 1914 to 1946, and a zinc oxide plant from 1922 to 1946.

From 1910 to 2000, DuPont operated a facility that was southeast of the area that Plaintiffs wish to designate as the Class Area for this litigation. From 1910 to 1949, DuPont manufactured lead arsenate at the facility. On February 1, 2015, DuPont transferred the property to Chemours, but Chemours never operated at the property. In June 2018, Chemours sold the property to a third party.

**B.     History of the EPA Action**

The EPA conducted initial testing in OU1 in 2007, and the USS Lead Site was listed on the National Priorities List in April 2009. In June 2009, the EPA began a series of investigations and studies at the site of the West Calumet Housing Complex. In July 2012, the EPA issued its proposed remediation plan for OU1. The EPA, choosing from a variety of remedial alternatives, proposed a plan that would reduce exposure of residents to contaminated soils that posed a health risk through the removal and off-site disposal of the soils, while still allowing for the continued residential use of properties impacted within OU1.

In November 2012, the EPA issued its Record of Decision establishing its remediation plan for OU1. The Record of Decision stated that "[t]he expected outcome of the Selected Remedy is that residents in OU1 will no longer be exposed to soil that poses a threat to human health. The land use of the properties will remain unchanged, and the Selected Remedy will allow for the continued residential use of impacted yards." (ROD 49, ECF No. 140-2 at 50.)

At the end of 2014 and pursuant to its remediation plan, the EPA collected soil samples from the properties of the West Calumet Housing Complex residents and tested those samples for lead and arsenic. In early June 2016, the EPA began mailing letters to the residents of the West Calumet Housing Complex to notify them of the test results. The letters, including one dated July 8, 2016, to Plaintiff Rolan, advised residents that the sampling results "show that lead and/or arsenic concentrations in soils at [the] property exceed health-based standards, and therefore [the] property qualifies for a cleanup of those soils which pose a risk." (ECF No. 1-5 at 5.) The letters advised that the cleanup of soils would be conducted at "NO COST" to the residents. (*Id.*)

The EPA explained that the cleanup would involve five steps: (1) a "[p]re-cleanup interview" with the resident, including documenting existing conditions of the property; (2) excavation of contaminated soils; (3) backfilling with clean soils; (4) restoration of landscaping and grass; and (5) a "[p]ost-construction interview" with the resident. (ECF No. 1-5 at 6.) The letter advised parents to prevent children from playing in dirt, to wash their children's toys regularly and to wash their children's hands after they played outside. All residents were advised to remove shoes before walking into their homes. It was recommended that residents not dig or garden in their yards. The EPA and staff from the Agency for Toxic Substances and Disease Registry also went door-to-door to residents' homes to provide them with additional information concerning the cleanup and how to reduce exposure to lead contamination.

In August 2016, the EPA issued a "Residents' Guide to Temporary Relocation" for the West Calumet Housing Complex. The Guide explained that the EPA was offering to

4

clean all homes in the West Calumet Housing Complex and that residents who wanted the EPA to clean their homes were "being asked to relocate temporarily while the cleaning is being done." (ECF No. 139-2 at 6.) The Guide stated that the EPA had "made arrangements with several hotels and motels which are being used as temporary housing for families during the cleaning of their homes" and that the EPA's "Relocation Team will work with [the residents] to find a suitable location for you and your family." (*Id.* at 12.) The EPA informed residents that the EPA will pay the housing costs related to residents' temporary relocation during the cleanup, including moving services and drivers available to take children to and from school. Residents were told to expect that they would be away from their homes for five to seven days. The EPA advised that residents' dishes, cookware, towels, clothes, and bedding were still safe to use.

The EPA also informed residents of the types of expenses that would not be eligible for reimbursement. The EPA made clear that although residents could choose to secure their own temporary housing—rather than staying at the hotels that the EPA arranged—they had to obtain the EPA's approval before making arrangements to rent or sublease housing.

The EPA cleaned Plaintiff Rolan's and Plaintiff Brooks's homes in 2016 and paid for their relocation during the cleanup.

**C.**     **West Calumet Housing Complex:  Resident Relocation; Demolition**

The Mayor of East Chicago sent his own letter to the residents of the West Calumet Housing Complex in July 2016. He acknowledged that the City and the East Chicago Housing Authority (the "ECHA") had recently been informed of the results of the EPA's

5

soil testing.[1] He advised that it was in the best interest of the residents to "temporarily relocate [their] household[s] to safer conditions." (ECF No. 1-5 at 19.) The letter advised that the ECHA would be assisting residents in the coming days and would continue to provide information.

In 2010, the ECHA had determined that most of the units in the West Calumet Housing Complex had reached the end of their useful life and would be too costly to repair. In a five-year plan, dated October 15, 2014, the ECHA identified the West Calumet Housing Complex for demolition or sale. In July 2016, in light of the EPA's findings, the ECHA expedited its application to the U.S. Department of Housing and Urban Development to begin removing residents from the West Calumet Housing Complex. At the same time, the ECHA informed West Calumet residents that soil testing had revealed high levels of contaminants. At the end of July, the ECHA issued a public notice stating that it desired to demolish 346 units located at the West Calumet Housing Complex. A public hearing was scheduled for August 3, 2016. At the August 3 public meeting, the West Calumet Housing Complex residents "were formally informed through a public hearing of the decision to expedite" permanent relocation of all residents of the West Calumet Housing Complex. (ECF No. 140-6 at 4.) The West Calumet Housing Complex was projected to be 100% vacant by April 2017. (*Id.* at 5.)

By August 5, 2016, HUD approved $1.9 million for tenant protection vouchers for new housing. By March 1, 2017, three-quarters of the West Calumet Housing Complex

---

[1] The ECHA owned and managed the West Calumet Housing Complex.

6

residents had relocated or were in the process of relocating. In September 2017, HUD approved ECHA's application to demolish the West Calumet Housing Complex.

**D.     Investigation Costs**

In October 2016, Plaintiffs' counsel engaged and paid Edward E. Garske of Carlson Environmental Consultants for a preliminary opinion as to what the West Calumet Housing Complex residents should do in response to the lead and arsenic in the soil

**CAUSES OF ACTION**

Count I of Plaintiff's Complaint is a claim for reimbursement of costs incurred in response to contamination pursuant to CERCLA, 42 U.S.C. § 9607. (*Id.* ¶¶ 33–41.) Under Count I, the Plaintiffs allege that they have

> incurred and continue to incur "response" costs within the meaning of . . . CERCLA, 42 U.S.C. §§ 9601(23)–(25), including, but not limited to, preliminary investigations of the contamination of Plaintiffs' . . . properties, and temporary housing and relocation costs. All such costs are necessary costs of response, and, to the extent required, consistent with the National Contingency Plan. Plaintiffs . . . will continue to incur such response costs in the future. Plaintiffs . . . are entitled to full reimbursement from Defendants for all such costs.

(Compl. ¶ 41.)

In Count III, Plaintiffs seek compensatory and other damages from DuPont for injuries resulting from DuPont's negligence. They allege out-of-pocket damages, temporary and permanent relocation costs, discomfort, aggravation, and annoyance. They also seek costs for replacing household items that they discarded before permanently relocating.

Plaintiffs seek certification of the following Class in pursuit of these claims:

7

> All persons who resided in the Class Area in July 2016 when the EPA announced that high levels of lead and arsenic were found in the Class Area.
>
> The Class Area is located in East Chicago, Indiana and is defined generally as bordered: (1) on the north by the northern boundary of the Carrie Gosch Elementary School and a line extending eastward from that boundary to the eastern edge of a north/south utility right of way that runs parallel to McCook Avenue north of East 149th Place; (2) on the east by: (i) the eastern-most edge of a north/south utility right of way that runs parallel to McCook Avenue until East 149th Place, and (ii) McCook Avenue between East 149th Place and 151st Street; (3) on the south by East 151st Street; and (4) on the west by the Indiana Harbor Canal.

(Pls.' Am. Mot. 2, ECF No. 129.)

## ANALYSIS

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "'A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites' for class certification have been met." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015) (quoting *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011)).

A party seeking class certification must first satisfy each of the requirements of Rule 23(a), showing that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 564 U.S. at 349.

For example, the issue addressed by Rule 23's typicality requirement is whether "the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The question whether the named plaintiff's claims are typical of those of the class members is closely related to the commonality inquiry. *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). The Seventh Circuit has summarized the typicality analysis as follows:

> A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same legal theory. Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large.

*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quotation marks and citations omitted); *see also De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual differences between" class member's claims, so long as those claims "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.").

If all the requirements of subsection (a) are satisfied, the party must then meet at least one of the provisions of Rule 23(b). Because Plaintiffs are seeking money damages,

9

they aim to satisfy subdivision (b)(3), which requires "that the question of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b).

These provisions do not "set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule" by submitting evidence to satisfy each provision. *Dukes*, 564 U.S. at 350; *see also Comcast*, 569 U.S. at 33. "The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Bell*, 800 F.3d at 373. In considering the evidence, a court is not concerned with whether it shows that the class is likely to succeed on the merits, but only whether it shows that the requirements for class certification have been met. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013); *Bell*, 800 F.3d at 377. That said, the inquiry frequently entails "some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.

### A. CERLCA § 107 Claims

CERCLA authorizes the EPA to act, consistent with the National Contingency Plan (NCP), to remove or arrange for the removal of hazardous substances, pollutants, or contaminants necessary for protection of the public health or welfare or the environment. 42 U.S.C. § 9604(a)(1). These provisions give the EPA broad powers "to select appropriate remedial actions determined to be necessary to be carried out" under the statute. *Id.* § 9621(a); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).

10

Section 107(a) of CERCLA creates a private right of action to recover "necessary costs of response incurred by any other person consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B). A prima facie case for CERCLA cost recovery requires a plaintiff to prove: "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008).

Additionally, when the plaintiff is a nongovernmental entity, plaintiff "must show that any costs incurred in responding to the release were 'necessary' and 'consistent with the national contingency plan (NCP).'" *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-44, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015) (quoting *Forest Park Nat'l Bank & Tr. v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012)); *see also City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (citing as third element of prima facie claim for recovery of response costs by a private-party plaintiff that the response costs were necessary and consistent with the NCP). As stated by the Tenth Circuit, "Section 107 provides that a person is only liable for private party response costs to the extent that these costs were incurred 'consistent with the national contingency plan.' Proof of response costs incurred 'consistent with' the NCP is, therefore, an element of the prima facie private cost recovery action under CERCLA." *Cty. Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 (10th Cir. 1991) (quoting 42 U.S.C. § 9607(a)(4)(B)); *see also NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (citing approvingly to the statement from *County Line* regarding elements of a prima facie response cost claim).

Response costs are those "costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005). These costs "are 'necessary' if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat." *Valbruna Slater Steel Corp.*, 2015 WL 8055999, at *4 (citing *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994)).

The EPA's Remediation Plan at the West Calumet Site was formulated consistent with the NCP. (*See* Consent Decree ¶ V.7, ECF No. 41-2.) The NCP contemplates "temporary relocation" when it is "necessary to protect public health or welfare." 40 C.F.R. § 300.415(f). Unlike investigation costs, the recovery of relocation costs requires "'[s]ubstantial compliance' with the NCP," *City of Gary v. Shafer*, 683 F. Supp. 2d 836, 853 (N.D. Ind. 2010) (citing *Norfolk S. Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 880 (N.D. Ill. 2001)), but "an immaterial or insubstantial deviation from the NCP will no[t] . . . be deemed inconsistent," *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 835 (8th Cir. 2000). The determination of "substantial compliance" with the NCP is made case-by-case, as "a significant deviation from procedures under one set of circumstances may be less serious in another." *R.E. Goodson Constr.*, 2006 WL 4916336, at *31 (quoting 55 Fed. Reg. 8793–94, Mar. 8, 1990).

Plaintiffs allege that they are entitled to recover from Defendants the preliminary costs of investigation and the costs they incurred for temporary housing and relocation. Having reviewed the applicable caselaw, the Court is not convinced that pursuing the CERCLA claim as a class action is appropriate. What strikes the Court as unique about a

CERCLA recovery cost claim by a private litigant is the focus on the private litigant's actions in relation to the contamination and to the NCP. Indeed, "Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions." *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 561 (S.D. Ill. 1994). "Superfund money [is not] available to compensate private parties for economic harms that result from discharges of hazardous substances." *Exxon Corp. v. Hunt*, 475 U.S. 355, 359–60 (1986); *see also Rhodes v. Cty. or Darlington, S.C.*, 833 F. Supp. 1163, 1179 (D.S.C. 1992) ("Response costs are themselves defined under the specific ambit of the Act, not under the generic calculus of the common law."). Whether response costs were necessary and consistent with the NCP is an element of a private party plaintiff's claim for recovery under § 107(a). Accordingly, the actions of the purported class members are as much an element of the claims as are the actions of the Defendants.

For this reason, it will not do for Plaintiffs to simply quote excerpts from cases where the same conduct or practice by the same defendant gave rise to the same kind of claims to establish that they have, in this case, presented a common question or a typical claim. In other words, simply connecting Defendants to the contamination in the Class Area does not show that class wide proceedings would "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (citation and emphasis omitted). Plaintiffs' identification of the common questions regarding the elements of their CERCLA recovery cost claim (Pl.'s Am. Mot. 20, ECF No. 129) does *not* include the crucial element that Plaintiffs incurred costs that can be identified as response costs that were necessary and consistent with the NCP. Nor can there be any quarrel with the

conclusion that those costs cannot be resolved with evidence that is common to the class as a whole. "If . . . the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Messner*, 669 F.3d at 815. Accordingly, this case involves at least one crucial question that would not be common to the class.[2]

Plaintiffs have not established that their claims, that they lived in the Class Area in July 2016 when the EPA announced high levels of contaminants in the soil, and then took investigative action and incurred costs for temporary housing and relocation, have the same essential characteristics as the claims of the class at large. There are any number of actions that residents could have taken, either in response to contamination as well as actions that were entirely unrelated and unnecessary. Plaintiffs have not identified any necessary and NCP-consistent costs that other potential class members likely incurred in furtherance of containment or cleanup.

> A class is disserved if its representative's claim is not typical of the claims of the class members, for then if his claim fails, though claims of other class members may be valid, the suit will at the least be delayed by the scramble to find a new class representative. Alternatively, a class representative's atypical claim may prevail on grounds unavailable to the other class members, leaving them in the lurch.

---

[2] As some questions would be common, and "even a single common question will do" for purposes of Rule 23(a)(2), *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (brackets and citation omitted), this may be better analyzed under the Rule 23(b)(3) predominance inquiry, which requires that common questions predominate over any questions affecting only individual class members. In any event, the outcome of the class certification inquiry is the same.

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). Further, these differences will not be due to particularized defenses or to a calculation of damages, but to whether Plaintiffs can establish as essential element of their claim—that they incurred qualifying costs.

Even with the shared experience of living in a housing complex within the USS Lead Superfund, there has been no showing of predominance, which is "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "Predominance is a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). The proposed class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Evaluating whether the costs, if any, incurred by the putative class members constitute recoverable CERCLA costs will require highly individualized inquiries into each class member's conduct in response to the contamination. These individualized inquires will predominate over any questions of law or fact common to the putative class members.

"If resolving a common issue will not greatly simplify the litigation to judgment or settlement of claims of hundred[s] or thousands of claimants, the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring." *Parko*, 739 F.3d at 1085. Finding no common issues that predominate over the individual ones that would

apply to the putative class and greatly simplify the litigation, the Court declines to certify the CERLA recovery cost claim as a class action.

**B.      Negligence Claim Against Dupont**

In Indiana, "[t]he essential elements for a negligence action are (1) a duty owed to the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014) (quotation marks omitted). To determine whether a duty exists, a court must balance "(1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns." *Id.* "[T]he foreseeability component of duty requires a more general analysis of the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 390 (Ind. 2016).

Under Indiana law, proximate causation requires both "factual causation" and "legal causation." *Fifth Third Bank v. CSX Corp.*, 306 F. Supp. 2d 841, 853 (N.D. Ind. 2004). A defendant's contamination need not have been *the* proximate cause, but only *a* proximate cause, of the plaintiff's injuries to succeed on a claim for negligence. *See Carey v. Ind. Physical Therapy, Inc.*, 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010).

Having examined the record, the Court finds additional information is necessary to determine whether Plaintiff's negligence claim against DuPont meets the requirements for class certification. Too many unanswered questions remain, which prevent the Court from determining whether Plaintiffs' theory of liability against DuPont can be proved on a classwide basis. "Courts have repeatedly drawn distinctions between proposed classes

16

involving a single incident or single source of harm and proposed classes involving multiple sources of harm occurring over time." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 241 F.R.D. 435, 447 (S.D.N.Y. 2007). Plaintiffs' negligence claim against DuPont appears to fit into the latter category, as the EPA has identified multiple sources of lead and arsenic. With regard to the high lead and arsenic concentrations in the West Calumet Housing Complex, which were the highest concentration in OU1, the EPA stated that the levels "appear to be related to the historical operations at the Anaconda Copper Company facility." (ROD 14, ECF No. 140-2.) Additionally, the EPA stated that USS Lead smelting operations "are the primary source of contamination" through airborne emissions and leaks and spills. (ROD 10.)

However, this does not mean that DuPont's actions did not also contribute to the contamination, and Plaintiffs have presented evidence that DuPont's operations may have caused contamination through airborne emissions. Evidence concerning the limitation of the geographical area encompassed by the Class Area, as well as the expected method of proving DuPont's liability might reveal that a causation determination as to one class member could be extrapolated to all members and—on the other side—that failure to prove that DuPont caused contamination for a particular property or yard would end the case for all members of the class. Currently, there is insufficient evidence in the record to determine whether the cause of the contamination that impacted the residents in the Class Area was identical for each of the plaintiffs and class members.

## CONCLUSION

For the reasons stated above, the Court DENIES IN PART the Amended Motion and Incorporated Memorandum for Class Certification [ECF No. 129]. The Court declines to certify the CERCLA recovery claim as a class action. The viability of class certification for the negligence claim REMAINS UNDER ADVISEMENT. By separate entry, the Court will set a telephonic scheduling conference to address the evidentiary hearing for the negligence claim against DuPont.

SO ORDERED on October 22, 2019.

                                            s/ *Holly A. Brady*
                                            JUDGE HOLLY A. BRADY
                                            UNITED STATES DISTRICT COURT