| | |
|---|---|
| LERITHEA ROLAN, and LAMOTTCA BROOKS, Individually, and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | CAUSE NO.: 1:16-CV-357-HAB-SLC |
| ATLANTIC RICHFIELD COMPANY, E.I. DU PONT DE NEMOURS AND COMPANY, and THE CHEMOURS COMPANY, | |
| Defendants. | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Partial Summary Judgment of Dupont and Chemours [ECF No. 156], filed by E. I. du Pont de Nemours and Company and The Chemours Company (collectively, "DuPont Defendants"). Plaintiffs Lerithea Rolan and Lamottca Brooks were residents of East Chicago, Indiana, living in the West Calumet Public Housing Complex (the "West Calumet Housing Complex") in 2016 when the Environmental Protection Agency (the "EPA") warned them of dangerous levels of lead and arsenic in the soil where they lived.

One of the Plaintiffs' claims against the DuPont Defendants is for cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Plaintiffs seek two categories of CERCLA costs: (1) investigative costs; and (2) temporary relocation costs. The DuPont Defendants contend that they cannot recover

either as a matter of law, and cite to the Court's previous grant of summary judgment in favor of Atlantic Richfield Company on the same CERCLA recovery claims. *See Rolan v. Atlantic Richfield Co.*, 1:16-cv-357-HAB-SLC, 2019 WL 5429075 (N.D. Ind. Oct. 22, 2019).

Plaintiffs filed their Response to Motion for Partial Summary Judgment of Dupont and Chemours [ECF No. 166], stating that although they disagree with the Court's decision granting Atlantic Richfield Company's summary judgment motion with respect to Plaintiffs' CERCLA claim, they recognize that the Court's previous decision will likely govern its decision with respect to the DuPont Defendants' motion for partial summary judgment. Further, because the arguments set forth by the DuPont Defendants are the same arguments made by Atlantic Richfield Company in its summary judgment motion, Plaintiffs adopted and incorporated by reference the arguments they made in their Response to Atlantic Richfield, including the statement of material disputed facts.

Because the facts concerning Plaintiffs' CERLCA claims against the Dupont Defendants are indistinguishable from those designated in support of the claims against Atlantic Richfield, the same reasons that supported judgment as a matter of law in favor of Atlantic Richfield support the summary denial of Plaintiffs' remaining CERCLA recovery claims. Those reasons are set forth below.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v.*

2

*Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## STATEMENT OF FACTS

Plaintiffs formerly resided in the West Calumet Housing Complex located in East Chicago, Indiana. The West Calumet Housing Complex was situated in what became designated as the USS Lead Superfund Site (the "Site"). The Site became the subject of a Consent Decree approved by a federal district court in 2014 that resolved CERCLA claims brought by the United States and the State of Indiana with respect to the Site. *See United States v. Atlantic Richfield Co., et al.*, No. 2:14-CV-312-PPS-PRC (N.D. Ind. Oct. 28, 2014).

The West Calumet Housing Complex was designated as "Zone 1" of Operable Unit One ("OU1") within the Site. The housing complex had been built on the former Anaconda Copper Company site, Atlantic Richfield's alleged predecessors-in-interest. Adjacent to OU1 is Operable Unit Two ("OU2"), which marks the location of the former USS Lead facility.

### A.     The EPA Investigation

The EPA conducted initial testing in OU1 in 2007. In April 2009 the Site was listed on the National Priorities List ("NPL") after the EPA tested the contamination

concentration levels at the USS Lead facility and OU1. This NPL designation rendered the Site eligible for CERLA-financed remedial action.

In June 2009, the EPA began a series of investigations and studies at the site of the West Calumet Housing Complex. EPA performed a Remedial Investigation of OU1 to "assess site conditions and collect data for the purpose of developing and evaluating effective remedial alternatives," which involved collecting and analyzing soil samples. (Ballotti Decl. ¶ 14(b), ECF No. 158-2.) The EPA also conducted a "baseline Human Health and Risk Assessment . . . to identify the current and potential threats to human health from the contaminants in the soil at OU1." (*Id.* ¶ 14(e)). In addition, the EPA performed a Feasibility Study "to develop and evaluate a range of remedial alternatives," each of which was evaluated in light of various criteria including "protectiveness of human health and the environment." (*Id.* ¶ 14(f)).

**B.      The EPA's Remediation Plan**

In June 2012, the EPA issued final reports on its Remedial Investigation and Feasibility Study. In early July 2012, the EPA issued and published its proposed remediation plan for OU1 and solicited public comment. The EPA, choosing from a variety of remedial alternatives, proposed a plan that would reduce exposure of residents to contaminated soils that posed a health risk, specifically through the removal and off-site disposal of the soils, while allowing for the continued residential use of impacted properties within OU1.

The initial thirty-day period for public comment ran from July 12 through August 11, 2012. At the request of the City of East Chicago, the EPA extended the public comment period until September 10, 2012.

Following the close of the public comment period and consideration of the comments received, in November 2012, the EPA issued its Record of Decision establishing its remediation plan for OU1. The Selected Remedy required several steps. First, soil that contained lead or arsenic in concentrations that exceeded the remedial action levels (400 ppm for lead and 26 ppm for arsenic) would be excavated to a maximum depth of 24 inches below ground surface ("bgs") and disposed of at a CERCLA-approved landfill. Then, clean soil would be placed in the excavated area to the original grade; if contaminated soil existed at depths greater than 24 inches bgs, a visual barrier would be placed above the contaminated soil before backfilling with clean soil. Further, institutional controls would be used for properties where contamination remained below the 24 inches bgs.

The Record of Decision stated that "[t]he expected outcome of the Selected Remedy is that residents in OU1 will no longer be exposed to soil that poses a threat to human health. The land use of the properties will remain unchanged, and the Selected Remedy will allow for the continued residential use of impacted yards." (ROD 49, ECF No. 158-1 at 50.)

## C.      Communication of Soil Testing Results and EPA Response

At the end of 2014 and pursuant to its remediation plan, the EPA collected soil samples from the properties of the West Calumet Housing Complex residents and tested

those samples for lead and arsenic. In early June 2016, the EPA began mailing letters to the residents of the West Calumet Housing Complex to notify them of the test results. The letters, including one dated July 8, 2016, to Plaintiff Rolan, advised residents that the sampling results "show that lead and/or arsenic concentrations in soils at [the] property exceed health-based standards, and therefore [the] property qualifies for a cleanup of those soils which pose a risk." (ECF No. 1-5 at 5.) The letters advised that the cleanup of soils would be conducted at "NO COST" to the residents. (*Id.*)

The EPA explained that the cleanup would involve five steps: (1) a "[p]re-cleanup interview" with the resident, including documenting existing conditions of the property; (2) excavation of contaminated soils; (3) backfilling with clean soils; (4) restoration of landscaping and grass; and (5) a "[p]ost-construction interview" with the resident. (ECF No. 1-5 at 6.) The letter advised parents to prevent children from playing in dirt, to wash their children's toys regularly and to wash their children's hands after they played outside. All residents were advised to remove shoes before walking into their homes. It was recommended that residents not dig or garden in their yards. The EPA and staff from the Agency for Toxic Substances and Disease Registry also went door-to-door to residents' homes to provide them with additional information concerning the cleanup and how to reduce exposure to lead contamination.

The EPA took additional measures to reduce exposure. Exposure to lead in contaminated soil only occurs if there is direct contact with the soil. Therefore, grass and mulch serve as a barrier to the chain of contact. The EPA identified any areas with no or poor grass cover and placed triple shredded hardwood mulch on those areas. The EPA

also worked with parties responsible for maintenance to alter mowing practices to reduce or eliminate the disturbance of dirt and mulch.

D.     **West Calumet Housing Complex:  Resident Relocation; Demolition**

In 2010, the East Chicago Housing Authority (the "ECHA"), which owned and operated the West Calumet Housing Complex,  had determined that most of the units in the West Calumet Housing Complex had reached the end of their useful life and would be too costly to repair. In a five-year plan, dated October 15, 2014, the ECHA identified the 346-unit West Calumet Housing Complex for demolition or sale. In July 2016, in consideration of the EPA's findings, the ECHA expedited its application to the U.S. Department of Housing and Urban Development to begin removing residents from the West Calumet Housing Complex.

The EPA had provided the results of the soil tests to the City of East Chicago and the ECHA on May 26, 2016. On about July 24, 2016, the Mayor of East Chicago sent his own letter to the residents of the West Calumet Housing Complex. He acknowledged that the City and the ECHA had recently been informed of the results of the EPA's soil testing. He advised that it was in the best interest of the residents to "temporarily relocate [their] household[s] to safer conditions." (ECF No. 1-5 at 19.) The letter stated that the ECHA would be assisting residents in the coming days and would continue to provide information.

The ECHA also informed West Calumet residents that soil testing had revealed high levels of contaminants. At the end of July, the ECHA issued a public notice stating that it desired to demolish the 346 units located at the West Calumet Housing Complex.

A public hearing was scheduled for August 3, 2016. At the August 3 public meeting, the West Calumet Housing Complex residents "were formally informed through a public hearing of the decision to expedite" permanent relocation of all residents of the West Calumet Housing Complex. (ECF No. 140-6 at 4.) The ECHA advised residents that they would have to move. The West Calumet Housing Complex was projected to be 100% vacant by April 2017. (*Id.* at 5.)

By August 5, 2016, the U.S. Department of Housing and Urban Development ("HUD") approved $1.9 million for tenant protection vouchers for new housing. The vouchers would allow residents to permanently relocate anywhere in the United States. By March 1, 2017, three-quarters of the West Calumet Housing Complex residents had relocated or were in the process of relocating. In September 2017, HUD approved ECHA's application to demolish the West Calumet Housing Complex. Demolition began in April 2018 and is now complete. [https://www.epa.gov/uss-lead-superfund-site/west-calumet-housing-complex-east-chicago-ind](https://www.epa.gov/uss-lead-superfund-site/west-calumet-housing-complex-east-chicago-ind) (last visited 12/3/19).

The EPA put its plan for soil excavation and restoration on hold during the permanent relocation efforts and pending demolition request. The EPA has proposed an amendment to the cleanup plan and conducted a feasibility study to evaluate cleanup options based on the City of East Chicago's stated intention to zone the parcel for residential use. (*Id.*)

### E. Interior Cleaning

In early August 2016, the EPA, realizing that interiors of homes might also be contaminated with lead and that permanent relocation of residents would take time to

complete, offered to clean the interior of occupied West Calumet Housing Complex units if the head of the household agreed to the cleaning. In connection with the offer, the EPA issued a "Residents' Guide to Temporary Relocation" for the West Calumet Housing Complex. The Guide explained that the EPA was offering to clean all homes in the West Calumet Housing Complex and that residents who wanted the EPA to clean their homes were "being asked to relocate temporarily while the cleaning is being done." (ECF No. 139-2 at 6.) The Guide stated that the EPA had "made arrangements with several hotels and motels which are being used as temporary housing for families during the cleaning of their homes" and that the EPA's "Relocation Team will work with [the residents] to find a suitable location for you and your family." (*Id.* at 12.) The EPA informed residents that the EPA will pay the housing costs related to residents' temporary relocation during the cleanup, including moving services and drivers available to take children to and from school. Residents were told to expect that they would be away from their homes for five to seven days. The EPA advised that residents' dishes, cookware, towels, clothes, and bedding were still safe to use.

The EPA also informed residents of the types of expenses that would not be eligible for reimbursement. Although residents could choose to secure their own temporary housing—rather than staying at the hotels that the EPA arranged—they had to obtain the EPA's approval before arranging to rent or sublease housing.

## F.     Plaintiffs' Residences

The EPA cleaned Plaintiff Rolan's and Plaintiff Brooks' homes in 2016. While Brooks' home was being cleaned, the EPA paid for her to say in a hotel and provided her

with money for food. Once her residence was cleaned, Brooks was permitted to return to her residence. Brooks did not return to her residence because she had decided to move permanently after receiving the Mayor's letter. She incurred expenses as she sought permanent housing, including for hotel rooms for herself and her children, transportation between the hotel and school, and childcare expenses.

The EPA cleaned Rolan's residence in September 2016. During the cleaning, Rolan stayed in a hotel room paid for by the EPA. The EPA also paid for most of Rolan's meals during her temporary relocation. Between July and October 2016, Rolan also stayed at her mother's house or her cousin's home, only staying at the West Calumet Housing Complex two or three days per week. Rolan also incurred gas and mileage expenses.

## G.    Investigation Costs

In October 2016, one of Plaintiffs' attorneys engaged and paid Edward E. Garske of Carlson Environmental Consultants ("Carlson") for a preliminary opinion as to what the West Calumet Housing Complex residents should do in response to the lead and arsenic in the soil.

## ANALYSIS

CERCLA authorizes the EPA to act, consistent with the National Contingency Plan ("NCP"), to remove or arrange for the removal of hazardous substances, pollutants, or contaminants necessary for protection of the public health or welfare or the environment. 42 U.S.C. § 9604(a)(1). These provisions give the EPA broad powers "to select appropriate remedial actions determined to be necessary to be carried out" under the statute. *Id.* § 9621(a); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). The NCP is "designed to

promote cost-effective measures to protect public health and the environment." *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 835 (8th Cir. 2000).

CERCLA § 107 provides, in pertinent part, that a responsible party is liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). Section 107(a) also creates a private right of action to recover "necessary costs of response incurred by any other person consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B). A prima facie case for CERCLA cost recovery requires a plaintiff to prove: "(1) the site in question is a 'facility' as defined by CERCLA; (2) the defendant is a responsible party; (3) there has been a release or there is a threatened release of hazardous substances; and (4) the plaintiff has incurred costs in response to the release or threatened release." *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 850 (7th Cir. 2008).

A nongovernmental plaintiff is additionally required to "show that any costs incurred in responding to the release were 'necessary' and 'consistent with the national contingency plan.'" *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-44, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015) (quoting *Forest Park Nat'l Bank & Tr. v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill. 2012)); *see also City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (citing as third element of prima facie claim for recovery of response costs by a private-party plaintiff that the response costs were necessary and consistent with the NCP). In the words of the Tenth Circuit, "Section 107 provides that a person is only liable for private party response costs to the extent that these costs were incurred 'consistent with the national contingency plan.' Proof of

response costs incurred 'consistent with' the NCP is, therefore, an element of the prima facie private cost recovery action under CERCLA." *Cty. Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 (10th Cir. 1991) (quoting 42 U.S.C. § 9607(a)(4)(B)); *see also NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (citing approvingly to the statement from *County Line* regarding elements of a prima facie response cost claim).

## A.    Costs of Investigation

Plaintiffs allege that they are entitled to recover from the Dupont Defendants the preliminary costs of investigation they incurred when they hired Carlson. The Dupont Defendants disagree and submit that they are entitled to judgment as a matter of law with respect to these costs because the evidence shows that Plaintiffs did not personally incur the investigation costs that were paid by legal counsel. Second, even if they had incurred the fees, they were duplicative of the EPA's work, did not further the investigation or remediation of the Site, and were only incurred in connection with the instant litigation.

### 1.    *Requirement that Costs be Incurred*

The CERCLA recovery statute requires that a cost be "incurred." 42 U.S.C. § 9607(a)(4)(B). "[T]he mere possibility, even the certainty, that an obligation to pay will arise in the future does not establish that a cost has been incurred, but rather establishes that a cost may be incurred, or will be incurred" for purposes of CERLA. *Trimble v. Asarco, Inc.*, 232 F.3d 946, 958 (8th Cir. 2000), abrogated on other grounds by *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). In *Trimble*, the court affirmed the dismissal of a CERCLA cost recovery claim because the plaintiffs did not "incur" the response costs that

were paid by plaintiffs' attorneys on a contingency basis. An obligation to reimburse counsel would not arise unless and until plaintiffs were successful in obtaining a final judgment, and then only to the extent of that judgment. 232 F.3d at 956–57. The court distinguished the potential future obligation from an existing legal obligation. *Id.* at 957–58.

Here, it is not disputed that counsel paid the fees to retain Carlson. Nor is there any dispute that counsel is representing Plaintiffs on a contingency basis in this litigation. Plaintiffs contend that this does not matter, as they are still responsible to pay the $500 fee, at least as far as they understand what might be required of them. (Brooks Dep. 56-57, ECF No. 138-1 (testifying that there was no written agreement with respect to paying the environmental consultant but expecting that she still owes money for the cost of the consultant); Rolan Dep. 66–67, ECF No. 138-2 (stating that she would rely on her attorney to determine when she would be required to pay the environmental consultant's fee, but that it would not depend on whether the suit was successful).)

The Court has reviewed Plaintiffs' testimony and finds that they did not establish that they had a basis for their personal knowledge regarding the obligation to reimburse counsel for the Carlson fees. They did not cite any concrete grounds for the understanding, except perhaps their Retainer Agreement with counsel. In the summary judgment briefing before this Court, both parties have proceeded under the assumption that the Retainer Agreement is the controlling document with respect to Plaintiffs' legal obligation to pay Carlson's fees. The Court will do the same.

The relevant portion of the Retainer Agreement provides,

> 4. In addition to the Attorneys' fees stated above, I agree, at the request of the Attorneys, to reimburse the Attorneys for all out-of-pocket expenses reasonably incurred in connection with their performance of services, including filing fees, witness and expert fees, fees for court reporters and transcripts, long distance telephone, messenger or overnight delivery services, copying costs, postage, supplies, travel expenses, deposits and other expenses as the Attorneys reasonably request. I authorize the Attorneys to deduct from the amounts collected all of the expenses they have incurred, and all expenses shall be deducted after the Attorneys' fee is calculated regardless of whether the case is certified as a class action.

(Rolan Retainer ¶ 4, ECF No. 138-9.) Thus, to the extent Plaintiffs testified that they would rely on their counsel, or that they understood they were responsible to pay the $500, they were, in a sense, correct. However, any testimony that they will, with certainty, be required to the pay the costs lacks evidentiary support. There is no evidence in the record that counsel has triggered the obligation by requesting reimbursement.

It is not even clear from the language of the Agreement whether they could make any such demand; paragraph 2, which precedes the paragraph at issue, states that "[t]here will be no charge *for services* in the prosecution of my said claims unless a recovery is made." (*Id.* ¶ 2 (emphasis added). The Agreement then addresses Attorneys' fees (*Id.* ¶ 3), followed by expenses incurred "in connection with their performance *of services*" (*Id.* ¶ 4 (emphasis added)). In any event, at this point, counsel—not Plaintiffs—has assumed the legal obligation to pay Carlson.

Speculation and subjective beliefs cannot create genuine issue of fact where the written document does not show that Plaintiffs have an existing legal obligation to reimburse counsel for the consultant's fees. As a matter of law, Plaintiffs have not "incurred" the costs of the investigation. Summary judgment in favor of the Dupont Defendants is appropriate.

## 2. *Requirement that the Costs be Necessary*

Regardless of whether Plaintiffs have incurred the investigation fee, Plaintiffs cannot recover if Carlson's work was duplicative of the EPA's investigation and was conducted in preparation for litigation. Plaintiffs' position is that Carlson was retained to review documents to provide advice as to whether they should leave the area of contamination, and this is a recoverable "removal" cost.

In October 2016, counsel for Plaintiffs talked to Edward Garske of Carlson and requested that he look at some documents and provide an opinion whether the residents should leave the area. Garske agreed that the charge would be no more than $500. Garske testified, however, that he began his review of the documents in February 2017 because that is when he received the documents. (Garske Dep. 13, ECF No. 138-10.) He may have also provided an opinion prior to that. (Garske Dep. 44, ECF No. 151-1.) The documents Garske reviewed consisted of EPA reports and correspondence related to the EPA's investigation and remediation of the site, correspondence from Mayor Copeland and the ECHA, and a news article discussing this Court's decision on Defendants' motions to dismiss. (Garske Dep. 24; Ex. 11, Garske Dep. Exs. 4-12 (documents reviewed by Garske), ECF No. 138-11.) Garske had a follow-up conversation with counsel to report his findings.

Although the extent of Carlson's opinion and the timeline is not without some ambiguity, the following facts are not in dispute and provide relevant context. In July 2012, the EPA issued a proposed remediation plan that required remediation of the soil in the yards at the West Calumet Housing Complex. In July 2016, the results of soil sample testing of the West Calumet Housing Complex properties were communicated to

residents, along with the remediation plan for the yards and tips for reducing exposure to contaminants in the soil. The Mayor of East Chicago sent a letter telling residents that it was in their best interest to temporarily relocate. In response to the Mayor's letter, Rolan made the decision to permanently leave the West Calumet Housing Complex and began staying with people she knew outside of East Chicago. Rolan confirmed her decision after speaking with her lawyer in August or September 2016. (Rolan Dep. 57, 62–63). Brooks also started looking for housing outside of the West Calumet Housing Complex after she received the Mayor's letter. (Brooks Dep. 112.)

During this same period, the ECHA advised that it would be seeking authority from HUD to demolish the West Calumet Housing Complex and residents would eventually be required to relocate permanently. Soon thereafter, the EPA communicated an offer to clean the inside of residences for those who requested. Sometime between July and October 2016, the EPA cleaned Brooks' residence. Rolan's residence was cleaned in September 2016.

Rolan's Retainer Agreement is dated September 10, 2016. (ECF No. 138-9.) In October 2016, Plaintiffs' counsel hired Carlson. On October 6, 2016, Plaintiffs filed their federal lawsuit.

Plaintiffs assert that their retention of Carlson was a "response" that qualifies as a "removal." The statute defines "response" as "remove, removal, remedy, and remedial action," along with related enforcement activities. 42 U.S.C. § 9601(25). "The terms 'remove' or 'removal' mean the cleanup or removal of released hazardous substances

from the environment," 42 U.S.C. § 9601(23). The statutory provision, in full, defines "remove" or "removal" to include:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). The only portion of this definition that could apply to Carlson's involvement is "actions as may be necessary to monitor, assess, and evaluate the release . . . of hazardous substances." However, Plaintiffs have not presented evidence that would permit the conclusion that Carlson monitored, assessed, or evaluated the release of hazardous substances. The EPA had already performed a remedial investigation, performed a feasibility study, issued a proposed plan for remediation, and issued its Record of Decision. It had also communicated with residents, letting them know the ground would be remediated. A follow-up communication offered to clean the interiors of their homes.

In short, the evidence before the Court does not support a conclusion that the $500 paid to Carlson to review documents and advise whether the residents of the West Calumet Housing Complex should leave their homes was "necessary to address" a threat to human health. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994). "Generally, 'investigative costs incurred by a private party after the EPA has initiated a remedial investigation, unless authorized by the EPA' are not considered necessary

because they are 'duplicative' of the work performed by EPA." *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1263, 1272 (E.D. Cal. 1997) (first citing *La.–Pac. Corp. v. Beazer Materials & Servs., Inc.*, 811 F. Supp. 1421, 1425 (E.D. Cal. 1993); then citing *United States v. Hardage*, 750 F. Supp. 1460, 1511–17 (W.D. Okla. 1990), aff'd 982 F.2d 1436, 1447–48 (10th Cir. 1992)). Whether Plaintiffs were reasonable in their conduct, or acted in good faith, is not relevant to the inquiry. *La.-Pac.*, 811 F. Supp. at 1425. Accordingly, Plaintiffs' claims of subjective confusion about what to do in response to mixed messages from governmental entities, and particularly the letter from the Mayor of East Chicago, is beside the point. The Court would, however, additionally note that none of the evidence designated to the Court supports the conclusion that the Plaintiffs made the decision to permanently relocate from East Chicago as a result of Carlson's services.

An additional barrier to recovery is its potential connection to the litigation as opposed to the contamination. "CERCLA's remedial scheme similarly does not include reimbursement for expenses incurred solely in preparation for litigation unless they significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." *Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1111 (E.D. Mo. 2016) (first quoting *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 91–92 (2d Cir. 2000); then quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1960)) (quotation marks and bracket omitted). For example, in *Syms v. Olin Corp.*, 408 F.3d 95, 104 (2d Cir. 2005), the court found that costs associated with counsel's efforts reviewing historical documents, analyzing boxes of data related to contamination, attempting to identify other potential responsible parties, commenting on work plans, and facilitating

site access were not recoverable because they were duplicative and did not significantly benefit the overall clean-up effort.

Plaintiffs challenge the allegation that the advice they sought from Carlson was a litigation-related expense, but they do not provide any evidence that disputes the timeline that appears to connect the retention of Carlson to their litigation rather than to their decision to leave East Chicago.[1] In any event, the Court finds that it would make no difference to the outcome. The Court understands Plaintiffs to assert that "Carlson's work was far different from mere oversight or duplication of EPA's work" like that performed in the cases cited above. (Pls.' Mem. 11.) However, Plaintiffs have not cited to a single authority that would permit recovery of costs incurred for the purpose of obtaining an opinion whether a resident should discontinue residing at a site where the EPA has established plans to remediate, much less when the opinion is based solely on review of documents like those Carlson reviewed here. The Court finds that Plaintiffs have not designated evidence from which a finder of fact could conclude that they are entitled to recoup Carlson's fees through a CERCLA recovery action.

**B.      Relocation Costs**

Plaintiffs seek recovery of costs associated with their temporary relocation efforts on grounds that the situation in East Chicago revealed that Plaintiffs had reason to relocate even after the EPA cleaned the interior surfaces of their homes. They submit that,

---

[1] Indeed, counsel's asserted ability to recover the fee as an out-of-pocket expense incurred in connection with their performance of services under the Retainer Agreement implies that it was an expense incurred in connection with the litigation.

in seeking temporary housing, they prevented, minimized, and mitigated danger to themselves and their children. Defendant asserts that the EPA selected a plan that specifically did not require West Calumet Housing Authority residents to relocate, except for the time it took to clean the interior of the residences. According to Defendant, not only were the costs unnecessary, but they were not compliant with the NCP.

Response costs are those "costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005). These costs "are 'necessary' if they are incurred in response to a threat to human health or the environment and they are necessary to address that threat." *Valbruna Slater Steel Corp.*, 2015 WL 8055999, at *4 (citing *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D. Ill. 1994)); *see also Wilson Rd. Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1113 (E.D. Mo. 2016) ("[B]ecause CERCLA's remedial scheme is aimed at promoting expedient cleanup of hazardous substances, a private party's actions must be 'closely tied to' an 'actual cleanup' to be necessary.").

The Court finds that, as a matter of law, Plaintiffs' expenses for temporary housing and related expenses, incurred because they decided to limit their time at the West Calumet Housing Complex, is an economic loss for which CERCLA was not intended to provide a remedy. "Superfund money [is not] available to compensate private parties for economic harms that result from discharges of hazardous substances." *Exxon Corp. v. Hunt*, 475 U.S. 355, 359–60 (1986); *see also Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1535 (10th Cir. 1992) (reviewing legislative history of statute and concluding that "both houses of

Congress considered and rejected any provision for recovery of private damages unrelated to the cleanup effort."); *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 561 (S.D. Ill. 1994) (noting that because "Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions," a private party must prove affirmatively that its costs were a necessary cost of response).

> CERCLA's purpose lies not in compensating victims, but in encouraging fast, efficient cleanup. Those private parties entitled to recover their costs are those parties who engaged in cleanup. They are the people at whom CERCLA directs its incentives: financial recovery of necessary costs associated with ridding the environment of the hazards. Lacking these incentives, Congress reasoned, private parties would not, or could not, act toward the public good; and it is the public good with which CERCLA is concerned. The private good requires no such incentives for pursuit. Traditional state law remedies are available.

*Holloway v. Gaylord Chem.*, 922 F. Supp. 1154, 1158 (E.D. La. 1996); *see also Rhodes v. Cty. of Darlington, S.C.*, 833 F. Supp. 1163, 1179 (D.S.C. 1992) ("Response costs are themselves defined under the specific ambit of the Act, not under the generic calculus of the common law.").

Plaintiffs' citation to the definition of removal, which includes "temporary evacuation and housing of threatened individuals," 42 U.S.C. § 9601(23), does not convince the Court that their claims fall within the scope of the statute. As the implementing regulations related to removal actions state, such costs must still be "necessary to protect public health or welfare." 40 C.F.R. § 300.415(f). Accordingly, leaving a residence primarily due to concern for one's own safety, while an understandable response, is distinguishable from a "necessary response" taken primarily to further the goal of prompt, efficient cleanup of a hazard. *Holloway*, 922 F. Supp. at 1159

(holding that expenses incurred because of evacuation of home were not compensable under CERLCA). Plaintiffs are critical of the *Holloway* court, arguing that it failed to recognize the definition of "removal." However, that court did not hold that evacuation costs were never compensable. Its decision turned on whether the costs were "necessary," not whether they fit within a category of costs defined in the statute. *Id.*

Here, the EPA's cleanup remedy did not require demolition. Nor did the lead agency determine that relocation or evacuation was necessary as part of the remediation plan. Although the property owner, ECHA, pursued demolition of the housing complex, demolition and permanent relocation was not part of the EPA's remediation plan. Nor have Plaintiffs designated evidence from which it could be determined that it was necessary for them to immediately leave their residences. Although their subjective reasons are not the deciding factor on necessity, the primary basis Plaintiffs provide for their decision is a letter from the Mayor of East Chicago advising that it was in their best interest to temporarily relocate, and their fear of exposure to harmful chemicals. It is undisputed that none of the EPA-generated documents or communications recommended relocation as necessary to address the contamination in the soil. Not even the ECHA's decision to demolish the housing complex ahead of a previously determined schedule—regardless of its reasons for doing so—required Plaintiffs to find alternative housing prior to their permanent relocation.

CERCLA "is fashioned to spend, in a cost-effective and environmentally sound manner, the limited funds available for the exorbitant costs of a cleanup action." *Ambrogi*

*v. Gould, Inc.*, 750 F. Supp. 1233, 1238 (M.D. Pa. 1990). Plaintiffs' out-of-pocket relocation costs are not a recoverable response cost.

## CONCLUSION

For the reasons stated above, the Court GRANTS the DuPont Defendants' Motion for Partial Summary Judgment [ECF No. 156].

SO ORDERED on December 16, 2019.

 s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT